81 P.3d 830 (2003)
150 Wash.2d 626
STATE of Washington, Respondent,
v.
Jerry Dawayne CHEATAM, Petitioner.
No. 73079-2.
Supreme Court of Washington, En Banc.
Argued June 26, 2003.
Decided December 11, 2003.
*832 Pattie Mhoon, Tacoma, for Petitioner/Appellant.
John Martin Neeb, Tacoma, for Appellee/Respondent.
Amanda Elizabeth Lee, Schroeter Goldmark Bender, Seattle, on behalf of Washington Association of Criminal Defense Lawyers, amicus curiae.
*831 MADSEN, J.
Jerry Cheatam, who was convicted of first degree rape, contends that police violated the state and federal constitutions when, acting without a warrant, an officer retrieved his shoes as evidence in this case from a jail property bag four days after Cheatam's arrest on an unrelated charge. He also claims that the trial court erred in excluding expert testimony on the reliability of eyewitness identification and that the prosecutor engaged in misconduct by commenting on the defense's failure to produce a witness to corroborate his alibi. We affirm Cheatam's conviction.

Facts
On January 5, 1996, 16-year-old M.M. was walking to her bus stop at 6:45 a.m. when a man grabbed her from behind, told her he had a knife, and led her over a dirt mound to the back of a house on the corner. She testified it was light enough to see where she was going, and to see houses and other landmarks. The man, a "black male," 6 Report of Proceedings (RP) at 360, was wearing a dark blue hooded sweatshirt. He told M.M. to lie down and take off her pants. In an effort to discourage the man, she told him she was having her period, but the man told *833 her to remove her tampon, which she did. The man then let go of her neck, and she saw the knife as he switched it from one hand to the other. He grabbed her neck again and put her legs over his shoulders. He then let go of her again briefly, and she heard paper ripping. At this point M.M. looked at the man's face for about five seconds because she "knew if I could I'd have to remember his face. I'd have to know it." 6 RP at 355. She testified she could see the features of his face and remembered them. When the man saw M.M. looking at him, he grabbed her again and turned her away from him. He raped her, and told her she was a "good girl." 6 RP at 359.
After he raped her, the man permitted M.M. to pull her pants up, asked her what time she caught the bus, and walked with his arm around her to the bus stop. He told her not to cry, and not to tell anyone or he would hurt her. He ran off, and when he was far enough away, M.M. ran home.
Her father and stepmother found her in her room curled up in a ball, sobbing hysterically. After she was calm enough, she told them what happened. They called the police, and later her stepmother took her to a hospital. An examination disclosed no trace evidence. Later that day, M.M. met with a sheriff's sketch artist and gave her a detailed description. The resulting sketch was admitted at trial.
A forensic investigator processed the rape scene, and recovered a tampon and photographed a footprint that was found in loose dirt on the hillside by the path the rapist had walked with M.M.
In March 1996, M.M. was shown a photomontage of six men, none of whom was Cheatam. She did not identify any as the rapist. On June 6, 1996, Detective Page showed her another photomontage, and M.M. looked at each photo, narrowed them to two, and deliberately picked No. 2 as the man who raped her. The police sketch prepared the day of the rape bears a striking resemblance to this photograph, which is a photograph of the defendant. Also on June 6, a search warrant for Cheatam's apartment was executed. That warrant originally related to another rape investigation, but was telephonically expanded on June 6 to include evidence of other rapes, including the rape of M.M. At the apartment, police seized a "blue, hooded jacket of some sort," 5 RP at 195, several condoms, and some shoes. The shoes' tread did not match the photograph taken from the scene of the rape of M.M.
On the day of the search, Cheatam was arrested at his apartment for an unrelated rape. He was booked into jail, and his clothing, shoes, and effects were inventoried and stored in the jail's property room. Four days later, Detective Page obtained the shoes from the property room, examined the tread, compared it to the photograph, and confirmed a visual match. He requested further testing. A forensic investigator also confirmed a visual match but could not conclusively testify to a match. Before trial on the rape of M.M., Cheatam moved to suppress evidence of the shoes on the ground they were unconstitutionally obtained without a warrant. The trial court denied the motion.
Cheatam's first trial resulted in an appeal, reversal and remand for a new trial. Prior to his second trial the court granted the State's motion to exclude Dr. Jeffrey Loftus's expert testimony on the reliability of eye witness testimony. Cheatam's second trial resulted in a mistrial prior to verdict. He was convicted following the third trial. At the third trial, the defense presented an alibi defense, i.e., that Cheatam was home at the time of the rape.
Following his conviction, Cheatam appealed. The Court of Appeals affirmed in a partially published opinion. State v. Cheatam, 112 Wash.App. 778, 51 P.3d 138 (2002), review granted, 149 Wash.2d 1008, 67 P.3d 1097 (2003). This court granted Cheatam's petition for discretionary review. The Washington Association of Criminal Defense Lawyers has filed an amicus curiae brief in support of Cheatam's claim that the trial court erred in excluding the expert witness testimony on the reliability of eyewitness identification.

Analysis
Cheatam maintains that the trial court erred in denying his motion to suppress *834 evidence of the shoes he was wearing when he was booked into jail on an unrelated rape charge. He does not assign error to any of the court's findings of fact entered following the suppression hearing. They are therefore verities on appellate review. State v. Hill, 123 Wash.2d 641, 647, 870 P.2d 313 (1994).
The trial court found that when the police searched Cheatam's apartment on June 6, 1996, he was present and not wearing shoes. After he was arrested on the other rape charge and transported to the Pierce County Detention Center, the officers obtained the expanded telephonic warrant. At the jail, Cheatam's clothing and shoes were placed into an individual property bag in the inmate property room at the jail. The clothing and shoes were itemized and listed on a booking property form that Cheatam was required to sign. On June 10, 1996, acting without a warrant, Detective Page obtained the shoes from the inmate property room and compared them to the shoe print impression photograph taken at the scene of the rape of M.M. Page delivered the shoes to a sheriff's forensic deputy, who advised Page that the shoe pattern matched that in the photograph. The shoes were then placed in the Pierce County Sheriff's Department property room as evidence.
The court also entered findings that according to the testimony of Pierce County Sheriff's Officer Connor, it was the policy of the jail that an inmate's property taken at booking could not be released to anyone except the inmate, except upon a written request submitted by the inmate and approved by the support squad sergeant or a court order. Page did not obtain a court order or Cheatam's consent to take the shoes from the inmate property room.
The trial court held that it would have been lawful for the officers to take the shoes at Cheatam's residence on June 6, 1996, pursuant to the search warrant, that the police had lawful custody of his clothing once he was taken into custody, "and so any subsequent search and seizure of the shoes by law enforcement ... is not an unlawful search and seizure." Clerk's Papers (CP) at 14 (Conclusion of Law 13).
The Court of Appeals affirmed on alternate grounds. That court concluded that once the shoes were placed in the inmate property room they were outside the scope of the search warrant executed at Cheatam's residence on June 6, 1996. This conclusion is correct, since the jail property room was clearly not the place designated in the warrant as the place to be searched. The Court of Appeals concluded, however, that Cheatam had failed to establish either a reasonable expectation of privacy in his shoes in the property room under the Fourth Amendment to the United States Constitution or a privacy interest under article I, section 7 of the state constitution, and therefore failed to establish a constitutional violation. Cheatam, 112 Wash.App. at 784-87, 51 P.3d 138. The Court of Appeals also concluded that the jail's policy regarding inmate property is inconsequential, noting the policy's purpose was not developed on the record and not available for review. Id. at 786, 51 P.3d 138.
Cheatam contends that Detective Page's retrieval of his shoes violates both the state and federal constitutional prohibitions against warrantless searches and seizures.
Fourth Amendment
Numerous decisions from other jurisdictions hold that an inmate has no reasonable expectation of privacy in his or her shoes, boots, or other personal items once they have been searched by the police in a lawful search incident to arrest or they have been properly inventoried following booking. The starting point is United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974). There, the defendant was arrested and placed in jail. The next morning his clothing was taken from him and held as evidence. The Court held that
once the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of *835 the property for use as evidence, on the other. This is true where the clothing and effects are immediately seized upon arrival at the jail, held under the defendant's name in the "property room" of the jail, and at a later time searched and taken for use at the subsequent criminal trial.
Edwards, 415 U.S. at 807, 94 S.Ct. 1234. Thus, the court indicated both that the clothing and effects could be searched and seized on the basis of a delayed search incident to arrest, and, as Professor LaFave concludes, also assumed that where
(i) an object lawfully came into plain view at the time of a search upon the arrestee's arrival at the place of detention, (ii) later investigation establishes that this item is of evidentiary value, and (iii) the item remains in police custody as a part of the arrestee's inventoried property, then it is permissible for the police, without a warrant, to retrieve that object and thereafter deal with it as an item of evidence.
3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 5.3(b) (3d ed.1996). The Court in Edwards also said: "Indeed, it is difficult to perceive what is unreasonable about the police's examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest." Edwards, 415 U.S. at 806, 94 S.Ct. 1234.
Edwards involved a seizure of clothing for evidentiary purposes in connection with the same offense for which the defendant was arrested. Cheatam maintains that a different situation is presented when the defendant is arrested on one charge, but the seizure of inventoried items is for an unrelated charge. However, most courts deciding this issue under the Fourth Amendment conclude that once an inmate's property is taken from him or her and inventoried and placed in a property room, the inmate's expectation of privacy is substantially or entirely reduced to the point that no constitutionally protectable interest remains. Thus, a "second look" at an inmate's inventoried property in connection with investigation of a crime unrelated to the one for which the defendant is arrested does not violate the constitution. E.g., United States v. Jenkins, 496 F.2d 57 (2d Cir.1974) (five-dollar bills placed in an envelope and locked in jail safe following inventory; later, federal agent viewed and seized money without a warrant as evidence of an unrelated crime; court held inmate loses reasonable expectation of privacy once money lawfully taken by police for safekeeping because whether in connection with the same crime or not the serial numbers of bills would in both cases be exposed to police view); United States v. Thompson, 837 F.2d 673 (5th Cir.1988) (once property has been seized with proper justification, inventoried and held by jail officials, expectation of privacy at least partially diminished; no reasonable expectation of privacy where later examination connects property to different crime); United States v. Turner, 28 F.3d 981 (9th Cir.1994) (arrest on unrelated state charges; inventory search and storage of inmate's effects; subsequent removal of a cap without a warrant did not violate Fourth Amendment); Jackson v. Delaware, 643 A.2d 1360 (1994) (arrest for concealed weapons violation; inventory search and impoundment of defendant's clothing and sneakers; court upheld later warrantless seizure of defendant's sneakers in connection with investigation where foot prints were found at a murder scene); State v. Copridge, 260 Kan. 19, 23-25, 918 P.2d 1247 (1996) (personal effects lawfully seized and retained by jail for safekeeping; defendant therefore has no expectation of privacy and officers may take a "second look" and remove items in connection with unrelated crime without a warrant); State v. Wheeler, 128 N.H. 767, 519 A.2d 289 (1986) (defendant's boots taken during inventory; boots later taken as evidence in unrelated burglary investigation where boot print found at scene; no state or federal constitutional violation because police had lawful possession of the defendant's personal effects); Oles v. State, 993 S.W.2d 103 (Texas Crim.App.1999) (arrest on unrelated charge; inventory and storage of personal effects; eight days later inmate's clothing taken without warrant to a medical examiner who matched blood on the shoes with murder victim's; no remaining reasonable expectation of privacy in clothing; court emphasizes that even if inmate had a subjective expectation *836 of privacy (not shown), it would not be one that society would deem reasonable); Williams v. Commonwealth, 259 Va. 377, 527 S.E.2d 131 (2000) (arrest on unrelated charge; inmate's effects inventoried and stored in locked storage room; officer obtained inmate's boots and had tread compared to prints found at murder scene; no reasonable expectation of privacy).
In a few cases, a warrantless "second-look" or retrieval of items from inventoried storage of inmate's property has been held to violate the Fourth Amendment, though generally under circumstances that are distinguishable from those in Cheatam's case. For example, in Brett v. United States, 412 F.2d 401 (5th Cir.1969) the court held that an inmate does not relinquish all reasonable expectations of privacy in property taken, inventoried, and stored following arrest. There, an officer conducted an exploratory search of the inmate's clothing that had already been subjected to an inventory search, finding traces of heroin on cellophane in the watch pocket of his pants. The court held this search was unconstitutional.[1] In Cheatam's case, his shoes had already been exposed to police view at the time his property was inventoried and placed in the property room.
The next question is whether the jail's policy restricting release of an inmate's property changes the analysis. Some cases suggest that once an inmate's expectation of privacy is lawfully lost, it might be regained as a result of some subsequent action. E.g., Wallace v. State, 373 Md. 69, 95, 816 A.2d 883 (2003) (dicta). One of the factors mentioned is whether the defendant had the right to exclude others from his belongings. Oles, 993 S.W.2d at 109.
As the Court of Appeals observed, the purpose of the jail's policy is not disclosed on this record. Thus, we cannot say whether the policy is intended to create or maintain a privacy interest in the inmate's property or, instead, to protect the jail and its staff in dealing with the inmate. Regardless of the purpose underlying the jail policy, however, we conclude that once governmental officials have already viewed an inmate's property during a valid inventory search, that exposure and resulting loss of expectation of privacy is not overcome by a jail policy. As the Texas court said, "[n]o situation imaginable is as alien to the notion of privacy than an arrestee sitting in a jail cell, completely separated from his effects that are lawfully controlled and inventoried by the very police that are investigating him." Oles, 993 S.W.2d at 109. Even if the inmate harbors a subjective privacy interest, assuming he or she knows of the jail policy, it is not one that society would agree is reasonable.
In accord with the majority of courts addressing the issue under the Fourth Amendment, we hold that once an inmate's personal effects have been exposed to police view in a lawful inventory search and stored in the continuous custody of the police, the inmate no longer has a legitimate expectation of privacy in the items free of further governmental intrusion.
Article I, section 7
Cheatam also argues that the shoe evidence must be suppressed under State v. Simpson, 95 Wash.2d 170, 622 P.2d 1199 (1980), because the retrieval of his shoes and their use as evidence in the case of rape of M.M. violates article I, section 7. In Simpson, the defendant was arrested and jailed for forgery. His personal effects, including a truck key, were inventoried and placed in a property box. The officers were suspicious about the truck the defendant had been driving, and used the vehicle's license plate number to run a registration check. That check showed the license plate had been *837 cancelled. One of the officers took the truck key from the property box, using it to gain access to the vehicle identification number (VIN). Learning that the VIN did not match the VIN assigned to the license plate, the police ran another check and found the truck was stolen. The defendant ultimately admitted he purchased the truck knowing it was stolen.
The defendant moved to suppress evidence produced by seizure of the VIN number and his subsequent incriminating statements; the trial court granted the motion and the State appealed. This court concluded that individuals have a reasonable expectation of privacy under the Fourth Amendment, as well as a privacy interest under article I, section 7 in the VIN located inside a locked truck. Simpson, 95 Wash.2d at 187, 622 P.2d 1199. The court also said the officers were not constitutionally entitled to use the key to open the truck. The court said:
When police arrest an individual, they may be entitled to use personal effects that he was carrying at the time of arrest, as evidence of the offense for which he was arrested. See United States v. Edwards.... The police may not, however, use a personal effect such as a key in subsequent investigations of totally unrelated offenses. See e.g., People v. Vogel, 58 Ill.App.3d 910, 374 N.E.2d 1152, 16 Ill.Dec. 377 (1978). Thus, the police in this case committed an unconstitutional seizure when they took a key, which was being held for a forgery suspect, and used it to investigate [a] separate offense....
Simpson, 95 Wash.2d at 188 n. 5, 622 P.2d 1199.
For several reasons we decline Cheatam's invitation to follow this footnote. First, the lead opinion in Simpson, which garnered four votes, concluded that the seizure of the VIN violated both federal and state constitutions. However, the concurring opinion was expressly based only on the Fourth Amendment. Simpson, 95 Wash.2d at 192, 622 P.2d 1199 (Utter, J., concurring). Thus, there is no majority analysis under the state constitution. Second, the lead opinion relies solely on Vogel, a case that simply does not stand for the stated proposition. Instead, in Vogel the defendant was arrested and searched at a bus station without, as the arresting officer conceded at trial, probable cause for arrest. During the search of the defendant's person, officers found a key that the officers used to open a bus locker where they found cocaine. The trial court granted the defendant's motion to suppress this evidence. On appeal, the Illinois intermediate appellate court concluded the police did not have probable cause to arrest, and the seizure of the key from his person was unconstitutional. Vogel, 58 Ill. App.3d at 914, 16 Ill.Dec. 377, 374 N.E.2d 1152. Vogel has nothing to do with an inmate's property inventoried and held by the police.
Third, the Simpson footnote rests entirely on cases decided under the Fourth Amendment (lead and concurring opinions) that do not currently represent the majority view on this issue (and in retrospect we believe it is questionable whether they did at the time the case was decided).[2]
*838 Finally, Simpson is distinguishable because, as the State notes, while the key was observable at the time of the inventory and placement in the property box, it was not the evidence of another crime; rather, it enabled the police to unlock the truck where the evidence, the VIN, was found. Here, the shoes themselves were the evidence of the other crime.
Rather than adhere to the Simpson footnote, we independently examine the issue under article I, section 7 without regard to Simpson. Article I, section 7 provides that "[n]o person shall be disturbed in his private affairs ... without authority of law." The relevant question whether there has been a search is "whether the State has unreasonably intruded into a person's `private affairs.'" State v. Boland, 115 Wash.2d 571, 577, 800 P.2d 1112 (1990). "If no search occurs, then article I, section 7 is not implicated." State v. Young, 123 Wash.2d 173, 181, 867 P.2d 593 (1994). The inquiry under the state constitution is broader than under the Fourth Amendment, and the inquiry focuses on "`those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant.'" Young, 123 Wash.2d at 181, 867 P.2d 593 (quoting State v. Myrick, 102 Wash.2d 506, 511, 688 P.2d 151 (1984)). "Article I, section 7 provides greater protection of a person's right to privacy than the Fourth Amendment." State v. O'Neill, 148 Wash.2d 564, 584, 62 P.3d 489 (2003); accord State v. Ferrier, 136 Wash.2d 103, 111, 960 P.2d 927 (1998). There are no express limitations on the right to privacy recognized under article I, section 7. O'Neill, 148 Wash.2d at 584, 62 P.3d 489; State v. White, 97 Wash.2d 92, 100, 640 P.2d 1061 (1982).
Once police have conducted a valid inventory search of an inmate's clothing and other effects at booking, and have placed them in storage for safekeeping in accord with a proper inventory procedure, the inmate has lost any privacy interest in those items that have already lawfully been exposed to police view. He or she is no longer entitled to hold a privacy interest in the already searched items free from further governmental searches. It makes no difference, as other courts have held under the Fourth Amendment and state constitutions, that an investigation is being conducted into *839 a different crime than the one the inmate was arrested for, because one's privacy interest does not change depending on which crime is under investigation once lawful exposure has already occurred. Here, Cheatam's shoes had obviously been observed when the booking inventory was conducted, and he thereafter had no privacy interest in them.
Cheatam maintains, though, that his case is analogous to cases where inventory searches of vehicles or their contents were held to be unconstitutional. In State v. Hendrickson, 129 Wash.2d 61, 917 P.2d 563 (1996), we held that the warrantless search of the defendant's vehicle was unlawful as an inventory search under article I, section 7. In State v. Houser, 95 Wash.2d 143, 622 P.2d 1218 (1980), the other case cited by Cheatam, the court concluded there was no valid reason for impoundment of the vehicle searched, and alternatively concluded that a search of luggage in the locked trunk was unconstitutional because lawful purposes of an inventory search could be satisfied without intruding into the locked trunk.
Neither of these cases are analogous to Cheatam's case. In neither case was there a lawful inventory search at booking during which the evidence was exposed to police view. Instead, in each case the lawfulness of the inventory search itself was at issue. In Cheatam's case, there is no claim that the inventory search conducted when he was booked into jail was unlawful. His shoes were clearly observable by the police during that search.
Finally, Cheatam argues that the jail policy restricting release of items placed in the property room compels a different result under article I, section 7. The inquiry, however, is the same: whether Washington citizens have held or should be entitled to hold a privacy interest in property lawfully seized, inventoried and held by jail officials. Cheatam offers nothing to suggest that the jail policy was intended to protect an inmate's privacy or that inmates have historically had a protectable interest in property properly seized and inventoried on booking, and common sense suggests to the contrary. Once the inmate's clothing and other effects have already been searched pursuant to a lawful inventory search, and exposed to police view, he or she no longer has a privacy interest in the items free from further governmental examination and use as evidence.
In sum, we hold that the trial court properly denied Cheatam's motion to suppress evidence of the shoes under article I, section 7.
Eyewitness Identification
Next, Cheatam maintains that the trial court erred in excluding expert testimony on the reliability of eyewitness identification. He contends that M.M.'s eyewitness identification is subject to question because the rape occurred at 6:45 a.m. in January, when it was still dark, that she saw the attacker's face for only about five seconds, that her attention was focused on the knife, and that her identification from a photomontage several months after the rape was made only after narrowing the selection to two photos. He also maintains that there were discrepancies in her identification. Cheatam maintains he should have been allowed to introduce Dr. Loftus's expert testimony about the effect of stress and violence, weapon focus, lighting and cross-racial identification on perception and memory.
The trial court read the transcript of Dr. Loftus's testimony presented in the first trial and offered by the defendant in response to the State's motion to exclude the expert testimony in the second trial.[3] The court found that Dr. Loftus had never met or tested M.M. or watched her testify, had no personal knowledge of the conditions under which she made her identification, and his testimony related to the victim's credibility, which was a jury question. The court concluded the testimony would not be helpful to the trier of fact, and, while the subject matters were appropriate for cross-examination, expert testimony was not needed. The court concluded *840 that the subject matter of Dr. Loftus's testimony is within the common knowledge, experience, and understanding of the jurors. The Court of Appeals found no abuse of discretion in the trial court's refusal to admit the expert testimony.
ER 402 provides that "[a]ll relevant evidence is admissible, except as limited by constitutional requirements or as otherwise provided by statute, [the Rules of Evidence], or by other rules or regulations applicable in the courts of this state." ER 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 403 then provides that relevant evidence may nonetheless "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
ER 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." In the case of scientific testimony, the expert (1) must qualify as an expert, (2) the expert's opinion must be based upon a theory generally accepted in the relevant scientific community, and (3) the testimony must be helpful to the trier of fact. State v. Allery, 101 Wash.2d 591, 596, 682 P.2d 312 (1984); State v. Moon, 45 Wash. App. 692, 696, 726 P.2d 1263 (1986) (quoting Allery). And, of course, the testimony must be relevant. State v. Atsbeha, 142 Wash.2d 904, 917-18, 16 P.3d 626 (2001). Admissibility of expert testimony under ER 702 is within the trial court's discretion. State v. Kalakosky, 121 Wash.2d 525, 541, 852 P.2d 1064 (1993); Moon, 45 Wash.App. at 696, 726 P.2d 1263.
The admissibility of expert testimony on the reliability of eyewitness testimony has received a great deal of attention over the past two decades. Where courts were once extremely reluctant to admit such testimony, at this point the significant majority of federal and state courts addressing the question have held that such evidence is admissible under an abuse of discretion standard. See, e.g., McMullen v. State, 714 So.2d 368 (Fla. 1998) (citing cases).[4] Underlying this shift in thinking are numerous studies relied upon by researchers as tending to show that certain subjects thought to be commonly understood are actually not as straightforward as thought. For example, there are numerous studies showing that contrary to many jurors' beliefs upon questioning, it is more difficult for people of one race to identify people of a different race. See generally Thomas Dillickrath, Expert Testimony on Eyewitness Identification: Admissibility and Alternatives, 55 U. MIAMI L.REV. 1059, 1063-65 (2001).
We have previously recognized that expert psychological testimony may be admitted to assist juries in understanding phenomena not within the competence of the ordinary lay juror. See, e.g., Allery, 101 Wash.2d 591, 682 P.2d 312 (testimony on battered woman syndrome admissible to explain why battered woman would not leave her mate, not inform police or friends, and fear increased aggression; testimony would be helpful to a jury in understanding these phenomena which were not within common understanding of lay persons); State v. Ciskie, 110 Wash.2d 263, 751 P.2d 1165 (1988) (in rape prosecution, State's expert testimony on battered woman syndrome admissible to help the jury understand the victim's delays in reporting alleged rape and failing to discontinue relationship with the defendant); State v. Janes, 121 Wash.2d 220, 850 P.2d 495 (1993) (expert testimony admissible regarding battered child syndrome to aid the jury in understanding the way in which the child perceives the *841 imminence of danger and the tendency to use deadly force to repel the danger).
And, with the majority of courts, we have also held that the question of admissibility of expert testimony on the reliability of eyewitness identification is within the discretion of the trial court, reviewed under an abuse of discretion standard. State v. Coe, 109 Wash.2d 832, 844, 750 P.2d 208 (1988); State v. Guloy, 104 Wash.2d 412, 430, 705 P.2d 1182 (1985).
Here, we are essentially asked whether to adopt the framework developed by Division One of the Court of Appeals for guiding the exercise of that discretion. Under its test, the Moon test, an abuse of discretion in excluding expert testimony on eyewitness identification may be found where the identification of the defendant is the main issue at trial, the defendant presents an alibi defense, and there is little or no other evidence linking the defendant to the crime. Moon, 45 Wash.App. 692, 726 P.2d 1263; see also, e.g., State v. Bell, 57 Wash.App. 447, 451, 788 P.2d 1109 (1990); State v. Ward, 55 Wash.App. 382, 384, 777 P.2d 1066 (1989); State v. Taylor, 50 Wash.App. 481, 488, 749 P.2d 181 (1988); State v. Johnson, 49 Wash.App. 432, 438, 743 P.2d 290 (1987). Division One has also said that such cases will involve "close and confusing" facts patterns that "cry out" for an explanation. Johnson, 49 Wash.App. at 439-40, 743 P.2d 290. "In other words, there must be serious contradictions in the eyewitness testimony, as well as a proper `fit' between those contradictions and the proposed expert testimony." 49 Wash.App. at 440, 743 P.2d 290. In addition, if the trial court's reasons for its decision are "fairly debatable," the exercise of discretion will not be reversed on appeal. Ward, 55 Wash.App. at 386, 777 P.2d 1066.
Cheatam maintains that if the Moon factors, as supplemented by Johnson, 49 Wash. App. 432, 743 P.2d 290, are satisfied, then it is an abuse of discretion for the trial court to exclude such expert testimony and a violation of his right to present admissible evidence in his defense. He claims the factors are satisfied. However, Division Two declined to follow Moon, reasoning that test does not reflect the appropriate exercise of trial court discretion. We agree.
First, while Moon suggests that its three-factor analysis is derived from other cases using the same or a similar analysis, that is not exactly the case. Instead, it appears largely based on the particular facts of one of the cases cited, Moon, 45 Wash.App. at 697, 726 P.2d 1263 (citing People v. McDonald, 37 Cal.3d 351, 376, 690 P.2d 709, 208 Cal.Rptr. 236 (1984), overruled on other grounds by People v. Mendoza, 23 Cal.4th 896, 4 P.3d 265, 98 Cal.Rptr.2d 431 (2000)). Second, the mere fact that the defendant presents an alibi defense, in and of itself, is a doubtful reason to more readily admit such testimony. Third, the test itself is too restrictive of the trial court's discretion, as evidenced by the numerous qualifications added to it. Fourth, a trial court may have good reason for excluding such testimony on some subjects the expert would testify to, regardless of the other evidence in the trial or the presence of an alibi defense. That is, a court can legitimately conclude that some subjects are a matter of common sense, for example, that a witness will have more difficulty identifying an individual seen in a dark alley than one seen in broad daylight, while other subjects are not so readily matter of common sense, for example, that lay people may not be as aware of the malleability of eyewitness confidence or weapon focus. Brian L. Cutler, Strategies for Mitigating the Impact of Eyewitness Experts, 37 PROS. 14, 19-20 (Jan./ Feb.2003). The Moon three-factor test does not account for these distinctions.
Finally, a criminal defendant has the right to offer the testimony of his or her witnesses in order to establish a defense. Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); see Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (the constitution guarantees a criminal defendant a meaningful opportunity to present a complete defense); Rock v. Arkansas, 483 U.S. 44, 52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (under the Sixth and Fourteenth Amendments to the United State Constitution, an accused in state court has the right to call witnesses to testify in his or her favor). The *842 Moon test's emphasis on whether the defense presents an alibi defense does not accord with this right, given that the expert's testimony may be just as relevant and helpful to the jury where the defendant raises a defense of mistaken identification, for example. It is also troubling that admission of the expert testimony hinges on the strength of the State's case on identity, making it appear that the defendant's right to present a defense is contingent on the weakness of the State's case.
We decline to adopt the Moon test. We conclude, instead, that where eyewitness identification of the defendant is a key element of the State's case, the trial court must carefully consider whether expert testimony on the reliability of eyewitness identification would assist the jury in assessing the reliability of eyewitness testimony. In making this determination the court should consider the proposed testimony and the specific subjects involved in the identification to which the testimony relates, such as whether the victim and the defendant are of the same race, whether the defendant displayed a weapon, the effect of stress, etc. This approach corresponds with the rules for admissibility of relevant evidence in general and admissibility of expert testimony under ER 702 in particular. After reviewing this record we find that excluding the expert's testimony in this case was not an abuse of discretion.[5]
The subjects that Cheatam identifies as requiring expert testimony are the effects of stress and violence, weapon focus, lighting, and cross-racial identification. Dr. Loftus would have testified that stress and violence render memory less accurate. Depending on the facts of a given case, this testimony may be very helpful to a jury's assessment of credibility. Here, however, M.M. testified that she realized that she would need to memorize the face of her attacker in order to identify him later, and that she carefully examined his face in order to do so. Additionally, on the day of the rape, M.M. met with a sketch artist, producing a drawing of the defendant that was nearly photo perfect. Thus, in this case, Dr. Loftus' testimony would have had only marginal relevance and would have been of debatable help to the jury. Therefore, refusal to admit expert testimony on this point was not so untenable as to constitute an abuse of discretion. Dr. Loftus also would have testified that where a weapon is involved in a crime, witnesses focus on the weapon and recall less of other surrounding details. Here, the evidence was that when the attacker held the knife to M.M.'s neck she could not see it; she only saw the knife for the brief time it took for the attacker to pass it from one hand to the other, and then she could no longer see it as it was again held to her neck. Thus, M.M. had little opportunity to actually focus on the weapon and Dr. Loftus' testimony would have provided little help to the jury. According to the offer of proof, Dr. Loftus would have also testified that in darker or dimmer situations a person is not capable of generating an accurate memory of a person's appearance. Arguably, the testimony offered on this point was within the common understanding of jurors. Here, the jury could assess whether it was likely that M.M. could see her attacker's face at 6:45 a.m. in January, given defense evidence that the sun did not rise until nearly 8:00 a.m. that morning. And, regardless of the early winter morning time, it is noteworthy that M.M. viewed her assailant from an extremely close range. See Ward, 55 Wash.App. at 386, 777 P.2d 1066 (witnesses had been within approximately *843 two feet of robber). The jury could also consider the strong evidentiary value of the police sketch in deciding whether M.M. could see her attacker's face. Id. (noting that one of the eyewitnesses had used a police Identi-kit to create a picture that bore an amazingly close resemblance to the defendant). Finally, Dr. Loftus would have testified about studies summarizing the greater difficulty in recognizing individuals from a different race than that of the observer. Here, the danger of cross-racial misidentification was minimal as shown by the very strong resemblance between the police sketch and Cheatam as discussed above. Accordingly, it is debatable whether Dr. Loftus' testimony on this point would have been helpful to the jury.
Cheatam argues, though, that there are many discrepancies in M.M.'s description of the attacker, making Loftus's testimony critical. He first points out that she described the rapist as having big buggy eyes, which she had not mentioned to the police or the sketch artist. Instead, she described his eyes as having heavy lids. The difference between heavy lidded eyes and buggy eyes, however, is not clear.
Cheatam also points out that M.M. described her assailant as having no facial hair. He relies on evidence that he had a goatee at the time of the rape. A home videotape, introduced at trial, taken by Cheatam's cousin Tracy Stewart the evening of January 6, 1996,[6] the day after the rape occurred, briefly showed Cheatam holding Tracy's new son. Stewart testified that at the time Cheatam had a "shaved goatee," 7 RP at 510, and when asked if he could see it from the videotape, responded "I believe so, yes." 7 RP at 515. At the request of the jury, an attempt was made to replay the video at a slower speed, but the attempt was not successful.
While Cheatam argues that this evidence establishes that he had facial hair at the time of the rape, it instead shows that if he had a goatee there was a question about how noticeable it was. It was described as a "shaved goatee," and presumably was therefore short. Apparently it was not easily visible in the videotape, as Stewart's comment and the jury's request to view it at a slower speed suggest. Also, as the prosecutor pointed out in closing argument, the videotape was taken the evening after the day of the rape, which occurred early in the morning. Some hair growth might be due to the passage of about a day and a half. Under these circumstances, Cheatam has not shown a significant discrepancy between the description given by M.M. that her assailant had no facial hair and the evidence that Cheatam had a goatee at the time of the rape.
We also note that both asserted discrepancies were thoroughly presented to the jury.
We conclude that whether the expert testimony proffered here was both relevant and helpful is debatable and, therefore, hold the trial court's decision not to admit Dr. Loftus's testimony under the facts of this case was a tenable exercise of discretion.
Cheatam's final contention is that the prosecutor's comments during closing argument questioning why Garrison did not appear as a defense witness in support of his alibi constituted misconduct that denied him a fair trial. The trial court allowed the State's argument, but declined to give a missing witness instruction. The Court of Appeals held that the prosecutor's comments were proper under the missing witness doctrine.
A trial court's ruling on a claim of prosecutorial misconduct is reviewed under an abuse of discretion standard. State v. Finch, 137 Wash.2d 792, 839, 975 P.2d 967 (1999). The defendant bears the burden of establishing misconduct, and that the conduct was prejudicial. Id. A new trial is not required unless there is a substantial likelihood that the improper argument affected the verdict. Id.
Generally, a prosecutor cannot comment on the lack of defense evidence because the defendant has no duty to present evidence. State v. Cleveland, 58 Wash.App. 634, 647, 794 P.2d 546 (1990). However, *844 under proper circumstances the prosecutor may comment on a defense failure to call a witness under the missing witness doctrine. Under this doctrine, where a party fails to call a witness to provide testimony that would properly be a part of the case and is within the control of the party in whose interest it would be natural to produce that testimony, and the party fails to do so, the jury may draw an inference that the testimony would be unfavorable to that party. State v. Blair, 117 Wash.2d 479, 485-86, 816 P.2d 718 (1991). The inference only arises where the witness is peculiarly available to the party, i.e., peculiarly within the party's power to produce. In addition, the testimony must concern a matter of importance as opposed to a trivial matter, it must not be merely cumulative, the witness's absence must not be otherwise explained, the witness must not be incompetent or his or her testimony privileged, and the testimony must not infringe a defendant's constitutional rights. Blair, 117 Wash.2d at 489-91, 816 P.2d 718. If the prosecutor properly invokes the missing witness doctrine, no prosecutorial misconduct occurs.
Evidence here showed that Cheatam worked for his aunt, Sherrie Cheatam. Rocky Garrison (then Shumate) also worked for Sherrie Cheatam. The defense called Sherrie Cheatam, who testified that Rocky had probably called Cheatam at home to wake him for work, thus implying that Cheatam was home at the time of the rape. Ms. Cheatam testified that she had never heard of a day when Rocky was unable to reach Cheatam. The defense did not call Rocky as a witness. The prosecutor mentioned the failure to call Rocky in closing.
Cheatam argues that invoking the doctrine here was misconduct. He first contends that Rocky was no more available to him than to the prosecution. He argues that if the prosecution believed Rocky's testimony would have been unfavorable to Cheatam, the State would have called her as a witness. However, being peculiarly available to a party does not mean that if the other party could call the witness, the doctrine is inapplicable. Instead, it means that
"there must have been such a community of interest between the party and the witness, or the party must have so superior an opportunity for knowledge of a witness, as in ordinary experience would have made it reasonably probable that the witness would have been called to testify for such party except for the fact that his testimony would have been damaging."
Blair, 117 Wash.2d at 490, 816 P.2d 718 (quoting State v. Davis, 73 Wash.2d 271, 277, 438 P.2d 185 (1968)). Availability "is to be determined based upon the facts and circumstances of that witness's `relationship to the parties, not merely physical presence or accessibility.' " Thomas E. Zehnle, 13 CRIM. JUST. 5, 6 (1998) (quoting United States v. Torres, 845 F.2d 1165, 1169 (2d Cir.1988)). Rocky was peculiarly available to the defense.
Cheatam also contends that her absence was satisfactorily explained. During argument following Cheatam's objection, he explained that he did not call Rocky because she had day care issues, she indicated she would be available the next day but that would be too late, and he made a tactical decision not to call her. However, this is not a satisfactory explanation because it is unclear why Cheatam could not have called her the next day (or at least asked for a continuance until the next day so she could testify).
Cheatam next argues that Rocky's testimony would be merely cumulative since Sherrie Cheatam had testified to the same facts that Rocky had. However, Sherrie did not telephone Cheatam, and only Rocky could testify as to whether she had done so.
Finally, Cheatam says that unlike the case in Blair, he did not testify. If this is a suggestion that the prosecution's invocation of the missing witness doctrine violated his right against self-incrimination, it is unpersuasive. There is no comment here relating to the defendant's failure to counter or explain the evidence, rather, the comment is on the defense failure to do so after presenting Sherrie Cheatam's testimony raising the point that Rocky called Cheatam. See United States v. Chirinos, 112 F.3d 1089, 1099-1100 (11th Cir.1997).
*845 Cheatam has not established prosecutorial misconduct in invoking the missing witness doctrine, and accordingly has failed to show that the trial court abused its discretion.

Conclusion
We hold that once an inmate's personal effects have been exposed to police view in a lawful inventory search and stored in the continuous custody of the police, the inmate no longer has a legitimate expectation of privacy under the Fourth Amendment in the items free of further governmental intrusion. Further, he or she has lost any article I, section 7 privacy interest in those items that have already lawfully been exposed to police view, and is no longer entitled to hold a privacy interest in the searched items free from further governmental search. In addition, we conclude that the trial court did not abuse its discretion in excluding expert testimony on the reliability of eyewitness identification. Finally, we hold that the prosecutor did not engage in misconduct by referring to a witness not called by the defense; the prosecutor's comments fell within the missing witness rule.
We affirm the Court of Appeals.
JOHNSON, IRELAND, BRIDGE, OWENS and FAIRHURST, JJ., concur.
CHAMBERS, J. (concurring in majority).
I agree with the majority that trial court decisions to admit or exclude expert testimony are reviewed for an abuse of discretion. I further agree that under the facts of this case, we cannot say that the trial court abused its discretion when it found Dr. Loftus's testimony unhelpful and therefore inadmissible under evidence rule (ER) 702. I write separately to emphasize that, under our rules of evidence, a trial court has discretion to admit, and should admit, relevant expert testimony if it finds that the testimony will assist the trier of fact. Accordingly, read properly, the majority opinion does not bar the admission of expert testimony regarding eyewitness memory and perception, nor does it hold it would have been an abuse of discretion to admit Dr. Loftus's testimony.
I agree with the dissent's concluding statement of the law: "the trial court has no discretion outside the rules of evidence to refuse [relevant and competent evidence]." Dissent at 837 (emphasis added). We have continually held that the trial court may exclude expert testimony under ER 702 when it finds the proffered testimony will not be helpful to the trier of fact. State v. Swan, 114 Wash.2d 613, 656, 790 P.2d 610 (1990); State v. Mak, 105 Wash.2d 692, 715, 718 P.2d 407 (1986); see State v. Allery, 101 Wash.2d 591, 597, 682 P.2d 312 (1984). The issue before us is not whether the expert testimony was relevant. Contra dissent at 835. Rather, the question we must answer is whether, in this instance, the trial court abused its discretion to exclude relevant testimony under ER 702.
I agree with both the majority's and the dissent's recognition that over the past two decades research has shed light onto the issue of eyewitness reliability. Majority at 840; dissent at 850. Further, I agree that illumination of eyewitness perception and memory by research is not necessarily within the common knowledge, experience, and understanding of the average juror. Majority at 840, 842 n. 5. Moreover, I agree with the majority that it is unnecessary for an expert to have interviewed or tested the eyewitness. Majority at 842 n. 5. However, an expert must give opinions specific to the facts of the particular case rather than testify about generalities. Finally, I am inclined to think that expert testimony regarding the effects of stress, violence, weapon focus, lighting, and cross-racial identification on eyewitness perception and memory would assist the trier of fact when, as here, the witness had approximately five seconds to view an armed attacker of a different race in the dark.
However, it is not this court's duty to supplant the trial court's discretion with our own. We noted long ago that trial courts must be afforded an amount of discretion in these matters because the line between that which is helpful and that which is unhelpful cannot be "very accurately drawn." State v. Smails, 63 Wash. 172, 179, 115 P. 82 (1911).

*846 The line of demarcation between matters that fall within the knowledge of mankind generally and matters that are the subject of special and peculiar knowledge cannot, from the nature of things, be very accurately drawn. The one, of necessity, shades into the other, and hence, even though the extremes of the opposing rules may be definitely marked and error predicated thereon easy of determination, the trial judge must have something of discretion whether he will or will not admit opinion evidence when the line of demar[c]ation between these rules is approached.
Id. I emphasize that our opinion today rests largely on the trial court's actual exercise of discretion. It also could have been an appropriate exercise of discretion under ER 702 for the trial court to find Dr. Loftus's expert testimony helpful and admissible, as the first trial court to consider the issue did. Accordingly, I concur with the majority.
SANDERS, J. (dissenting).
Three main issues are presented by this appeal: (1) whether a warrantless police seizure of the defendant's tennis shoes from a jail locker violates his rights under the Fourth Amendment to the United States Constitution[1] and/or article I, section 7 of the state constitution;[2] (2) whether the trial court's refusal to allow testimony from a defense expert on eyewitness identification constitutes reversible error; and (3) whether the prosecutor's invited adverse inference based upon the defense's failure to call a witness is misconduct meriting reversal. I do not reach the third issue because I answer "yes" to the first two.
I. Warrantless seizure.
The majority's willingness to disregard State v. Simpson, 95 Wash.2d 170, 622 P.2d 1199 (1980), is troubling. See majority at 837-38. Closely analogous to these facts, defendant Simpson was arrested for first degree forgery, and his property, including a truck key, was inventoried and placed in a property box. Simpson, 95 Wash.2d at 173, 622 P.2d 1199. After further investigation it appeared to police that the truck may have been stolen, at which point police simply removed the key from the property box, without benefit of warrant, and utilized the key to open the locked vehicle to search for its vehicle identification number. Id. This court held the search unconstitutional and suppressed the evidence because the police failed to procure a warrant for a new search for a different crime after the initial inventory. Id. at 187-88 & n. 5, 622 P.2d 1199. Like Simpson, police here arrested Cheatam for one crime, but later searched and seized his inventoried shoes for evidence of an unrelated second crime. I cannot fairly distinguish the facts of Simpson from the facts of the case at bar.
The majority notes that the lead opinion in Simpson was signed by four justices; however, Chief Justice Utter's concurring opinion specifically agrees on the point at issue:
The Fourth Amendment bars the police, once the booking search and seizure is completed, from invading a police property box without probable cause.
. . . .
Respondent's Fourth Amendment rights as to his effects in the property box did not vanish simply because they were handled by the police.
Simpson, 95 Wash.2d at 192-93, 622 P.2d 1199 (Utter, C.J., concurring) (citations and footnote omitted). Chief Justice Utter did not need to discuss the article I, section 7 argument because the search violated a federal right necessarily included within the state constitutional guaranty. Id. at 192, 622 P.2d 1199 (Utter, C.J., concurring). Therefore in Simpson five justices of our court expressly agreed that a similar search violated *847 the Fourth Amendment, and implicitly determined the search violated the state constitution as well. The majority readily concedes (and rightfully so), "`Article I, section 7 provides greater protection of a person's right to privacy than the Fourth Amendment,' " majority at 838 (quoting State v. O'Neill, 148 Wash.2d 564, 584, 62 P.3d 489 (2003)); accord State v. Jackson, 150 Wash.2d 251, 259, 76 P.3d 217 (2003) ("It is now settled that article I, section 7 is more protective than the Fourth Amendment."), meaning the Simpson majority necessarily concluded Simpson's state constitutional rights were violated since the Fourth Amendment violation was expressly found.
Although the majority may disagree with the holding in Simpson, the unconstitutionality of a warrantless postinventory search was in fact the holding. Simpson is binding precedent until or unless it is overruled; however, for it to be overruled there must be "a clear showing that an established rule is incorrect and harmful." State v. Berlin, 133 Wash.2d 541, 547, 947 P.2d 700 (1997). For the reasons which follow, the holding was not incorrect, although even if it were, I cannot see how requiring the police to obtain a warrant under these circumstances would be "harmful."
State v. Hendrickson, 129 Wash.2d 61, 917 P.2d 563 (1996), is also on point, though the majority attempts to distinguish it. Majority at 839. In Hendrickson the defendant was on work release when arrested for selling cocaine to a fellow inmate. Id. at 66, 917 P.2d 563. After the arrest the police seized his truck parked in the county jail parking lot and conducted an inventory search, finding no contraband. Id. at 67, 76-77, 917 P.2d 563. Four days later the police, acting on an anonymous tip, again searched the truck without a warrant and found incriminating evidence. Id. at 67, 72, 77, 917 P.2d 563. We held the search violated article I, section 7 because the police did not carry their burden to show the last search fell within any "jealously and carefully drawn" exception to the warrant requirement. Id. at 77, 917 P.2d 563.
The majority discounts Hendrickson claiming there was no "lawful inventory search at booking during which the evidence was exposed to police view." Majority at 839. However, the Hendrickson court specifically held:
In this case, the police informed Hendrickson of their intent to forfeit his truck on February 15, but they did not serve the necessary formal summons to forfeit the truck until February 20, the day after they searched it. The police conducted an inventory search on February 15 and discovered no contraband. They parked the truck in the jail parking lot. The police search on February 19 was investigative in nature ....
Because the State has not carried its burden of overcoming the "per se unreasonable" presumption by demonstrating any of the narrow exceptions to a warrant applied to the search of Hendrickson's vehicle on February 19, we hold the search was unconstitutional and that the trial court should have suppressed the evidence produced in that search.
Hendrickson, 129 Wash.2d at 76-77, 917 P.2d 563 (second and third emphasis added). The case at bar falls squarely within the holding of Hendrickson. The police inventoried Cheatam's shoes when he was initially arrested and conducted a constitutionally permissible inventory search that was noninvestigative in nature. But four days later, without a warrant, the police again searched with investigative intent Cheatam's property held in custody for Cheatam's benefit. Just as "[Cheatam's] shoes were clearly observable by the police during [the inventory] search," majority at 839, Hendrickson's truck was "clearly observable" by the police when they searched it in their own parking lot. The police sought the incriminating evidence within the truck, just like the police here sought the distinctive tread on Cheatam's shoe. Yet we held in Hendrickson that the police had to prove one of the exceptions to the warrant requirement. Hendrickson, 129 Wash.2d at 77, 917 P.2d 563. To be consistent the police must be held to the same burden here. Since this warrantless search does not fall within an exception to the warrant *848 requirement,[3] its fruits must be suppressed.
The majority relies heavily on United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974) and cases from other jurisdictions to assert Cheatam had no expectation of privacy in items contained in his locker and thus there was neither search nor seizure of its contents. Majority at 834-835. Edwards does not stand for that proposition. In Edwards the police arrested the defendant, held him overnight in a jail cell, and searched his clothes the day after the arrest to find evidence of the crime for which he was arrested. 415 U.S. at 802, 94 S.Ct. 1234. The Court upheld the search of the clothes not because Edwards had a reduced expectation of privacy, but rather because it was a search incident to the original lawful arrest. Id. at 805, 94 S.Ct. 1234. Contrary to the majority's position, the Court expressly did "not conclude that the Warrant Clause of the Fourth Amendment is never applicable to postarrest seizures of the effects of an arrestee." Id. at 808, 94 S.Ct. 1234.
Similarly, the Fifth Circuit has reiterated:
We are not prepared to say that an accused whose effects are held by the police for safekeeping has, by the single fact alone of the police custody of the property, surrendered his expectations of the privacy of those effects.
Brett v. United States, 412 F.2d 401, 406 (5th Cir.1969). Despite the majority's attempt to discount its precedential value, Brett is still good law.[4]
Certainly a defendant has no legitimate expectation of privacy if the public has access to the area in which he or she claims to be private. E.g., State v. Jeffries, 105 Wash.2d 398, 414, 717 P.2d 722 (1986) (no reasonable expectation of privacy in storage areas located in woods). And no one would dispute that the police may examine and scrutinize every piece of evidence lawfully seized and kept as evidence. But the majority essentially transmogrifies the inmate property room into another evidence room. In the instant case Cheatam's shoes could not be released to anyone except Cheatam, someone authorized by Cheatam's written request that is also approved by the support squad sergeant or a court order. Clerk's Papers (CP) at 11, Findings of Fact (FF) No. 9. Absent a court order or his authorization Cheatam could have expected that his effects would not be disturbed. And that expectation was reasonable.
"Common sense" is the last refuge of the majority when it suggests an inmate has no privacy interest in his or her effects stored for safekeeping. Majority at 839-840. I posit common sense suggests quite the contrary. Walls separate these functionally different rooms and closed containers hide their contents from prying eyes. One room may be to store evidence necessary to convict an arrestee, but the other is used to safeguard the arrestee's personal effects while he or she is incarcerated, as the trial court here so found. See CP at 11, FF No. 9. The State had no right to take Cheatam's property without a court order. And correction officers, as bailors of the defendant's property, *849 do not have an unbridled license to open any container holding the defendant's personal effects. The warrantless search was unlawful.
II. Expert testimony.
The heart of the majority's analysis of Dr. Loftus's proposed testimony centers on a trial court's "discretion" to admit or reject evidence. Majority at 840-843. The majority opines whether Dr. Loftus's testimony was relevant and helpful is "fairly debatable" and therefore asserts we should not disturb the trial court's resolution of that debate. Majority at 843. But what the majority fails to consider is the lack of trial court discretion to refuse relevant evidence, especially when a defendant's constitutional right to present a defense is at issue, as well as the obvious relevance of this particular testimony.
With some exceptions,[5] none of which here apply, "[a]ll relevant evidence is admissible." ER 402 (emphasis added). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401 (emphasis added). If expert testimony is relevant it is admissible so long as the witness is qualified, the opinion is based upon a theory generally accepted in the relevant scientific community, and the testimony would be helpful to the trier of fact. See State v. Allery, 101 Wash.2d 591, 596, 682 P.2d 312 (1984).
Obviously the credibility of the victim's eyewitness account in this case is not only "relevant" under the most basic definition of the term, but it goes to the very heart of whether Cheatam was in fact the perpetrator. "The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." United States v. Wade, 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Eyewitness error is the most prevalent cause of wrongful convictions.[6] In the case at bar M.M. testified she viewed her attacker for "only about five seconds maybe," 6 Verbatim Report of Proceedings (VRP) at 355, and it was a cross-racial identification which is particularly problematic, see Thomas Dillickrath, Expert Testimony on Eyewitness Identification: Admissibility and Alternatives, 55 U. MIAMI L.REV. 1059, 1064 (2001).
Nevertheless, the trial court concluded, and the Court of Appeals agreed, Dr. Loftus's testimony was "within the common knowledge, experience, and understanding of the jurors," and therefore would not have been helpful. Majority at 840. Yet the majority itself cites authority that eyewitness accounts and their reliability are not necessarily within the common knowledge, experience, and understanding of jurors and that expert testimony to this effect can be very helpful. See majority at 840 (citing Dillickrath, supra, at 1063-65). The majority persuades me on this point!
The trial court may have discretion to determine what is relevant evidence, but it has no discretion to disallow evidence that is relevant. And discretion exercised may be abused. This is especially true in criminal trials where a person's life, liberty, and property can be taken. The United States Supreme Court has said as much, noting that a defendant has an absolute right to present a defense, including one's own witnesses for one's defense. Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); see also Taylor v. Illinois, 484 U.S. 400, 409, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). We have followed this rule. See State v. Maupin, 128 Wash.2d 918, 924, 913 P.2d 808 (1996). Refusing relevant evidence denies the defense its right to call a witness on its behalf and its right to argue the facts and circumstances of the case to the jury as they may have been developed through the testimony *850 of the excluded witness. See Washington, 388 U.S. at 19, 87 S.Ct. 1920.
The problem with the majority's analysis is that it attacks the persuasiveness of Dr. Loftus's testimony, not its relevance. Dr. Loftus would have testified that (1) stress and violence, (2) weapon focus, (3) lighting, and (4) cross-racial identification all could have rendered M.M.'s memory less accurate. See majority at 842. In this case there was: (1) a violent rape, (2) with a weapon, (3) that occurred during darkness, and (4) by a person of the opposite race. Whether M.M. had a clear recollection of her assailant, never focused on the knife, viewed her assailant from close range, or gave a description with a "very strong resemblance"[7] to Cheatam all go to the persuasiveness of Dr. Loftus or lack thereof. While I have no doubt the prosecution could make a strong argument that M.M.'s identification was, all considered, reliable, it was an argument for the prosecution to make  not the court. But, persuasiveness has no bearing on relevance. If Dr. Loftus's testimony would have had "any tendency to make [M.M.'s eyewitness account] more probable or less probable than it would be without" the testimony, ER 401 (emphasis added), it was relevant and the trial court had a duty to admit it. Dr. Loftus's testimony was unquestionably relevant under ER 401 and I do not read the majority to say it would have been error to admit it, only that it would prefer to abdicate its responsibility to be the final arbiter of the law in deference to the trial court. The right to appeal becomes a hollow one if our function is merely to rubber stamp.[8]
Quite telling is the majority's bottom line: "We conclude that whether the expert testimony proffered here was both relevant and helpful is debatable and, therefore, hold the trial court's decision not to admit Dr. Loftus's testimony under the facts of this case was a tenable exercise of discretion." Majority at 842. I disagree. The relevance of this evidence is not debatable. If the consequence of the evidence is fairly "debatable," it is up to the jury to conduct that debate, not this court. If the evidence is relevant and competent, the defense has the right to introduce it, and the trial court has no discretion outside the rules of evidence to refuse it.
For these reasons I dissent.
ALEXANDER, C.J. (concurring in dissent).
I agree with the majority that the trial court did not err in excluding expert testimony on the reliability of eyewitness identification and in determining that there was no prosecutorial misconduct when the prosecutor commented on the defense's failure to produce a witness. I disagree, however, with its conclusion that the search of Cheatam's shoes was constitutionally permissible under the fourth amendment to the United States Constitution. As this issue is determinative, I concur in the result Justice Sanders would reach.
I write separately because I disagree with Justice Sanders' conclusion that the decision in State v. Simpson, 95 Wash.2d 170, 622 P.2d 1199 (1980), was also based on article I, section 7 of the state constitution. As the majority here observes, in Simpson five justices determined that the search at issue violated the Fourth Amendment. There was, however, no decision based on the state constitution because one of the five justices in the majority, Chief Justice Utter, expressly stated that it was unnecessary to apply the state constitution once the court determined that the search violated the federal constitution. Id. at 192, 622 P.2d 1199 (Utter, C.J., concurring). Nevertheless, Simpson's Fourth Amendment holding is binding under the doctrine of stare decisis unless this court determines that it is incorrect or harmful. State v. Robbins, 138 Wash.2d 486, 494, 980 P.2d 725 (1999). The majority fails to demonstrate *851 that Simpson is incorrect or harmful. Therefore, I dissent.
NOTES
[1] The Fifth Circuit has distinguished Brett on the basis that the second inspection was to look for something that had not been discovered at the time of the inventory, and thus was not a second look at an item with respect to which an expectation of privacy had at least partially dissipated. United States v. Thompson, 837 F.2d 673, 675-76 (5th cir.1988); United States v. Grill, 484 F.2d 990, 991 (5th Cir.1973). Brett also preceded the decision in Illinois v. Lafayette, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983), where the Court held that a search of an arrestee's shoulder bag, or any other article or container in his or her possession in accord with established inventory procedures is proper under the Fourth Amendment. Thus, insofar as Brett rested on earlier precedent generally prohibiting such an inventory search, it is no longer sound law.
[2] Chief Justice Alexander's concurrence in the dissent says that State v. Simpson, 95 Wash.2d 170, 622 P.2d 1199 (1980) stands as precedent on whether the Fourth Amendment is violated by a "second look" at items inventoried and stored by police after booking an individual, and claims that the majority has failed to follow the decision as binding or to explain why it is incorrect or harmful. This claim is surprising, and mistaken for at least three reasons. First, as just explained, the only case relied on in the four person lead opinion in Simpson is People v. Vogel, 58 Ill.App.3d 910, 374 N.E.2d 1152, 16 Ill.Dec. 377 (1978), and that case has nothing to do with the issue presented either in the Simpson footnote or here. For this reason, the footnote in Simpson is incorrect. Further, as also explained, the Fourth Amendment view stated in the lead and concurring opinions probably did not represent the majority at the time Simpson was decided. In addition to Vogel, the concurrence in Simpson cites several cases decided under the Fourth Amendment. Most have no application in Cheatam's case. People v. Smith, 103 Cal.App.3d 840, 163 Cal.Rptr. 322 (1980) involved the search of a wallet that had been inventoried and safely stored in a locked container. The court concluded that because the officer's purpose in inspecting the inmate's purse and wallet a second time was to look for at least one item not previously noted (an address), the inspection unconstitutionally intruded into whatever vestige of privacy remained to the inmate. Smith, 103 Cal.App.3d at 845, 163 Cal.Rptr. 322. Later cases have distinguished Smith as being inapplicable where the item was in plain sight, or previously inventoried and knowingly in police possession when seized. E.g., People v. Davis, 84 Cal.App.4th 390, 100 Cal.Rptr.2d 835 (2000); People v. Superior Court. (Gunn), 112 Cal.App.3d 970, 169 Cal.Rptr. 559 (1980). State v. Harrington, 284 N.W.2d 244 (Iowa 1979) is also cited in the Simpson concurrence. It is uncertain why, since that case is factually indistinguishable from Edwards. That is, the police took the defendant's jacket from the defendant on the morning following his arrest for murder as evidence of that crime, since it matched the color of a jacket police had been told the murder weapon was wrapped in. Harrington, 284 N.W.2d at 246. The court concluded that no Fourth Amendment violation occurred where the police had probable cause to believe the jacket was evidence of a crime and examined and held the jacket after his arrest. Finally, the concurrence relied on a dissent in Farrie v. State, 255 Ind. 681, 266 N.E.2d 212 (1971) (dissent). (Reeves v. State, 599 P.2d 727 (Alaska 1979) and State v. Kaluna, 55 Haw. 361, 520 P.2d 51 (1974), also cited by the Simpson concurrence, were decided under state constitutions.) The third reason why Simpson should not be followed is that overwhelming authority is to the contrary. In addition to the decisions cited above at pages 835-836, other cases also hold that an inmate has an insufficient privacy interest in property for a Fourth Amendment violation to occur, upon the police taking a "second look," after that property has already been taken from him or her, inventoried, and placed in a property room. This is true even if the "second look" is in connection with an offense other than the one for which the individual is jailed. E.g., Lockhart v. McCotter, 782 F.2d 1275 (5th Cir.1986); United States v. Grill, 484 F.2d 990 (5th Cir.1973); United States v. Lacey, 530 F.2d 821 (8th Cir.1976); United States v. Johnson, 820 F.2d 1065 (9th Cir.1987); United States v. Oaxaca, 569 F.2d 518 (1978); Ex parte Hilley, 484 So.2d 485 (Ala. 1985); State v. Bible, 175 Ariz. 549, 858 P.2d 1152 (1993); Gunn, 169 Cal.Rptr. 559; People v. Salaz, 953 P.2d 1275 (Colo.1998); Barrera-Palamin v. State, 250 Ga.App. 580, 551 S.E.2d 76 (2001); State v. Richards, 94 Ill.2d 92, 445 N.E.2d 319, 67 Ill.Dec. 839 (1983); State v. Costello, 231 Kan. 337, 644 P.2d 447 (1982); Wallace v. State, 373 Md. 69, 816 A.2d 883 (2003); Commonwealth v. Murphy, 6 Mass.App. 335, 375 N.E.2d 366 (1978); State v. Harden, 639 S.W.2d 90 (Mo.Ct.App.1982); State v. Luna, 93 N.M. 773, 606 P.2d 183 (1980), abrogated on other grounds, Horton v. California, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); People v. Natal, 75 N.Y.2d 379, 553 N.E.2d 239, 553 N.Y.S.2d 650 (1990); Marquez v. State, 754 P.2d 705 (Wyo.1988).
[3] The State's pretrial motion to exclude Dr. Loftus's testimony, made prior to the second trial, was not reargued during the third trial.
[4] A minority of courts have a per se rule of exclusion of such testimony, and a third group of courts have a limited admissibility approach, finding an abuse of discretion when such evidence is excluded where there is no substantial corroborative evidence tying the defendant to the crime. See Thomas Dillickrath, Expert Testimony on Eyewitness Identification: Admissibility and Alternatives, 55 U. MIAMI L.REV. 1059, 1060 (2001).
[5] We do, however, have concerns about certain aspects of the court's ruling. The trial court found that Dr. Loftus never met or tested M.M. and had no personal knowledge of the circumstances under which she made her identification. We do not agree that the failure to meet or test M.M. is a relevant or even appropriate consideration, since an expert has no legitimate role in assessing the credibility of a witness. The court also said that the expert testimony would not be helpful to the trier of fact, and the subjects were within the common knowledge, experience and understanding of the jurors. While this might be a valid reason as to a particular subject or subjects in a given case, we cannot tell whether this reason is based upon the particular circumstances of this case, or whether the court was expressing the view that expert testimony on the reliability of eyewitness identification is never helpful to the jury. If the latter, we disagree. As indicated, expert testimony on eyewitness identification may be very helpful to a jury on subjects that are not, contrary to popular thinking, commonly known.
[6] Cheatam erroneously states in his appellate briefing that the videotape was recorded June 6 rather than January 6. Br. of Appellant at 25; Pet. for Review at 14.
[1] The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. CONST. amend. IV.
[2] "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." CONST. art. I, § 7.
[3] The police cannot meet this burden because none of the exceptions apply. Those exceptions are (1) consent, (2) exigent circumstances, (3) searches incident to a valid arrest, (4) inventory searches, (5) plain view, and (6) Terry investigative stops (Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Hendrickson, 129 Wash.2d at 71, 917 P.2d 563. It is conceded that this was not an inventory search (that had already occurred). See majority at 833. Moreover, this was in no way a "search[] incident to a valid arrest." A delay of "more than an hour" is too long. See United States v. Chadwick, 433 U.S. 1, 15-16, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); see also United States v. Vasey, 834 F.2d 782, 786 (9th Cir.1987) (delay of 30-45 minutes unreasonable), cited with approval in State v. Smith, 119 Wash.2d 675, 683, 835 P.2d 1025 (1992). Cheatam's shoes were searched four days after his arrest, well past being "contemporaneous with the arrest." Smith, 119 Wash.2d at 683, 835 P.2d 1025.
[4] The majority cites Illinois v. Lafayette, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) as authority for its claim that Brett is "no longer sound law." Majority at 836 n. 1. Lafayette involved the search of a shoulder bag when the police booked the defendant. Lafayette, 462 U.S. at 641-42, 103 S.Ct. 2605. It did not involve a second search of items that had already been stored in inventory, as was the case in Brett. Thus, any claim that Lafayette somehow disapproved or overruled Brett is completely mistaken.
[5] E.g., ER 402 (relevant evidence excluded if prohibited by rule, statute, constitution, etc.); ER 403 (relevant evidence excluded if its probative value is substantially outweighed by unfair prejudice, etc.).
[6] C. RONALD HUFF ET AL., CONVICTED BUT INNOCENT: WRONGFUL CONVICTION AND PUBLIC POLICY 64, 66, 86-87 (1996); see also Michael R. Headley, Note, Long on Substance, Short on Process: An Appeal for Process Long Overdue in Eyewitness Lineup Procedures, 53 Hastings L.J. 681, 682 (2002).
[7] Majority at 842-43.
[8] Indeed, this appears to be the approach taken by the concurrence, which opines we should never intrude into this allegedly exclusive province of the trial court. See concurrence at 845. I opine, however, that this court must be ever vigilant in its duty to protect the accused's constitutional right to present a complete defense, and that this court must be equally vigilant not to intrude upon the province of the jury, which is and should be the ultimate decider of the persuasiveness of relevant expert testimony.