FILED
COURT OF APPEALS
DIVISION II

2014 AUG 12 PM 12: 43

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42919-5-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JOHN ALLEN BOOTH, JR., | |
| Appellant. | |

BJORGEN, A.C.J. — A jury convicted John Allen Booth Jr. of one count of second degree murder, two counts of first degree murder, one count of attempted first degree murder, one count of attempted first degree extortion, and one count of first degree unlawful possession of a firearm after finding that Booth shot four people while attempting to collect a drug debt. Booth appeals, claiming that (1) the to-convict jury instruction violated his right to trial by jury and (2) the State presented insufficient evidence to allow a conviction on the attempted extortion charge. In a statement of additional grounds, Booth also alleges that (3) the State obtained evidence against him in violation of the Privacy Act, chapter 9.73 RCW; (4) the prosecutor committed misconduct when cross-examining him; (5) the trial court infringed his right to counsel; and (6) the trial court erroneously imposed legal financial obligations that his indigence prevents him from paying. We affirm.

## FACTS

Booth visited David West's house on August 8, 2010 to discuss a drug debt, arriving with Robbie Russell and Ryan McCarthy. Russell dealt methamphetamine, and Booth collected debts arising from Russell's illicit trade.

During the visit, West spoke privately with Russell while Booth sat and talked with West's family. Booth asked questions about West's grandchildren in a manner that unnerved West's daughter and son-in-law. At the end of West's conversation with Russell, Booth, McCarthy, and Russell left. After they departed, West looked "scared" and "upset." Verbatim Report of Proceedings (VRP) (Dec. 12, 2011) at 203. West told his daughter to take her family and leave. She found this unusual, since West typically wanted to spend as much time as possible with his grandchildren and had never ordered her away.

A week later, Booth and McCarthy returned to the West residence. Booth spoke privately with West, took money and drugs from him to pay toward West's debt, and then left. A third person who visited West with Booth and McCarthy testified that, as they drove away, Booth and McCarthy discussed the need to contact someone, presumably Russell, because West could not pay the debt in full. During this discussion, Booth and McCarthy spoke about taking West's motorcycle as a means to satisfy the outstanding debt.

Booth and McCarthy visited West a third time just after midnight on the night of August 20, 2010. John Lindberg, a good friend of West and his longtime girl friend, Denise Salts, arrived for a visit at the same time and entered West's house with the two men. After introductions, Lindberg, Booth, and McCarthy sat at the kitchen table and talked with West.

2

On this third visit, Booth apparently planned to take possession of a different vehicle, West's truck, to satisfy West's outstanding debt. Booth and West discussed the truck, and Booth asked to see pictures of it. West obliged, and then Booth and West went outside to speak privately. West looked "pretty calm" as he went out, but he returned to the kitchen red-faced and looking "stressed." VRP (Dec. 7, 2011) at 146. West asked Lindberg if he had any money. Lindberg replied that he had $100 and then, when West left the kitchen to go the master bedroom, Lindberg followed and told West he could actually lend West more, but did not want Booth to know that.

West then grabbed a shotgun, returned to the kitchen, cocked the gun, and pointed it at the table, beginning a confrontation that ended in Booth fatally shooting West. Booth then shot Salts, Tony Williams, an acquaintance of West who was also present in the house, and West's teenage son. Williams and West's son died from their wounds; Salts survived.

Booth and McCarthy apparently either mistook Williams for Lindberg or forgot Lindberg was there; they never searched the house to find him, and he remained safely hidden until they left. Lindberg then fled the house. Neighbors soon called 911 to report the shots and two cars fleeing West's property, one of which was Lindberg's white Camaro. Police contacted Lindberg, and he described the events at West's house, identifying Booth as the shooter and McCarthy as a participant in the massacre. Salts later identified Booth as her assailant and McCarthy as the man arriving at the house with Booth from a photographic montage.

Booth fled Lewis County after the shooting. Law enforcement officers traced him to Spokane using his cell phone records and electronic communications he sent to his girl friend. This electronic trail led to the residence of Eric Zacher, who had once shared housing with Booth

3

while in the custody of the Department of Corrections. Police began surveillance of Zacher and discovered and arrested Booth at Zacher's neighbor's house.

Booth was detained in the Lewis County Jail after his capture in Spokane. After learning that Booth had attempted to circumvent routine monitoring of jail phone calls, police officers listened to the recording of a call Booth had made to Zacher. Booth made references during that call which led the officers to believe he was discussing a firearm still at the house where police arrested him. The officers asked Spokane police to search the house where Booth was arrested to look for the weapon. Spokane police returned to Zacher's neighbor's house and searched the house with the resident's consent. The officers discovered a gun in the attic, which was later identified as the murder weapon.

The State charged Booth with second degree murder for the shooting of West, two counts of first degree murder for the deaths of West's son and Williams, first degree attempted murder for shooting Salts, attempted first degree extortion for his efforts to collect West's debt, and first degree unlawful possession of a firearm. The State sought (1) to enhance the sentence for each count because Booth committed multiple current offenses; (2) to enhance the sentence for the murder, attempted murder, and attempted extortion counts because Booth committed the offenses while armed with a firearm; and (3) to enhance the sentence for the two first degree murder charges because of an egregious lack of remorse. Booth pleaded not guilty to each charge.

Because Booth initially faced the possibility of receiving the death penalty for his crimes, the trial court appointed two attorneys to represent him as required by Superior Court Special

4

Proceedings Rules – Criminal (SPRC) at 2.[1] After the State filed notice that it would not seek the death penalty, the trial court declared it wanted to "revisit the issue of two counsel for Mr. Booth." VRP (May 17, 2011) at 47. At a hearing on the issue, the trial court stated that Booth merely faced prison time, the same as any other defendant not eligible for the death penalty, and like those defendants should have only one representative. The trial court told Booth's attorneys to choose which of them would continue to represent him, and one withdrew in compliance with the trial court's order.

The State tried Booth before a jury. The State presented extensive evidence that Booth shot Salts, West, West's son, and Williams. Salts and Lindberg both testified and identified Booth as the shooter. One of Booth's friends testified that the morning after the shooting Booth had called him and admitted to killing someone. Officers testified about the phone call from jail between Booth and Zacher that led to the recovery of Booth's firearm in Spokane. A forensic scientist testified that the weapon recovered in Spokane fired the bullets used to wound Salts and kill West, West's son, and Williams. Another forensic scientist testified that the recovered murder weapon had Booth's, and only Booth's, genetic material on it.

The State also presented evidence about Booth's attempted extortion. Using ER 404(b)'s common scheme or plan exception, the State offered extensive testimony about Booth's collections of drug debts in August 2010.[2] One of Booth's co-workers testified that Booth

---

[1] Where the "death penalty has been or may be decreed," SPRC 2 requires that "[a]t least two lawyers shall be appointed for the trial." SPRC 1, 2.

[2] ER 404(b) provides that
> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may,

planned to collect a $20,000 debt the weekend of the murder. One of West's friends testified to West's desperation to raise money the day of the shooting and West's attempt to sell his boat for $1,000 after paying $6,500 for it in order to obtain the needed cash. Another witness identified Booth as, in essence, Russell's enforcer and collection agent and testified that Booth had come to discuss collecting a debt for Russell the day of the murders. A fourth witness testified about Booth's threats to kill family members to collect on a debt. West's daughter and son-in-law testified about the first visit by Booth, Russell, and McCarthy and how West had immediately sent them home after the men departed. Both also testified that Booth's questions about their children had frightened them. Finally, Lindberg testified about West's private conversation with Booth outside the house just before the murders and how West had returned looking stressed and agitated.

Booth testified in his own defense, and his version of events differed starkly from that offered by the State's witnesses. Booth claimed that West owed him money because he had "fronted" West a pound of high-grade methamphetamine to sell. VRP (Dec. 14, 2011) at 61-62. On the day of the murders, he and a friend had dropped by West's house to collect one of the weekly installment payments he and West had arranged. Because West did not yet have the money, but believed he would have it later that night, Booth left his friend with West and went about other business.[3] Booth's friend later informed him that he had committed the murders. Booth claimed that he arranged to meet the friend the next day and took possession of the murder

---

however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[3] Booth testified that the friend he left at West's had the "government name[]" of, alternatively, "Joe Nameless" and "Joe Mama." VRP (Dec. 14, 2011) at 79, 81, 83, 102.

weapon in order to keep his friend out of trouble. Because he had heard that the police sought

him as a suspect in the murders, Booth went "on the lam." VRP (Dec. 14, 2011) at 66-67, 75.

The trial court instructed the jury using language from the criminal pattern jury

instructions over Booth's objections. These "to convict" instructions informed the jury, in part,

that

> [i]f you find from the evidence that each of these elements has been proved
> beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>   On the other hand, if, after weighing all of the evidence, you have a
> reasonable doubt as to any one of these elements, then it will be your duty to
> return a verdict of not guilty.

CP at 527, 530, 532, 536, 540 (Booth challenges all to-convict instructions). Booth presented

alternatives to these instructions, but the trial court declined to give them.

The jury returned a verdict of guilty on all counts; it also found each of the sentence

enhancements the State sought. Because Booth already had two convictions for violent felonies,

the jury's verdict required the trial court to sentence Booth under Washington's persistent

offender statute. *See* RCW 9.94A.570. Pursuant to that statute, the trial court imposed four

consecutive life sentences on Booth, one for each of the murder and attempted murder

convictions, plus an additional 60 months for the attempted extortion conviction and 116 months

for the unlawful possession of a firearm conviction. Booth's sentence also included mandatory

and discretionary legal financial obligations (LFOs). Booth appeals.

## ANALYSIS

Booth claims that all of his convictions are invalid because the "to convict" instructions

were constitutionally infirm, the prosecutor committed misconduct, and the trial court denied his

right to counsel. In addition, he challenges his murder and attempted murder convictions by

7

asserting the trial court erred under the Privacy Act by allowing the State to admit evidence about the murder weapon. He further challenges his attempted extortion conviction by alleging that the State failed to present sufficient evidence for a conviction. Finally, he alleges the trial court unconstitutionally imposed LFOs. We affirm.

## I. THE TO-CONVICT INSTRUCTIONS

Booth assigns error to the "to convict" instructions given by the trial court, each of which informed the jury that, if it found the State had proven the elements of the charged crime beyond a reasonable doubt, it had a duty to return a verdict of guilty. Booth alleges that the "'duty'" language in the instructions misstated the law by eliminating the jury's ability to return a verdict of not guilty despite the State's presentation of evidence of his guilt beyond a reasonable doubt. Br. of Appellant at 27 (quoting CP at 527, 530, 531, 536, 540). Booth claims that this misstatement violated his right to have a jury determine his guilt, protected by article I, sections 21 and 22 of the Washington State Constitution and the Sixth and Fourteenth Amendments to the United States Constitution. We find no error.

We review de novo allegations of constitutional violations or instructional errors. *State v. Lynch*, 178 Wn.2d 487, 491, 309 P.3d 482 (2013); *State v. Brown*, 132 Wn.2d 529, 605, 940 P.2d 546 (1997). Jury instructions suffice where, when taken as a whole "they correctly state applicable law, are not misleading, and permit counsel to argue their theory of the case." *Brown*, 132 Wn.2d at 618.

Much like Division One of our court, "we thought that this issue was resolved." *State v. Moore*, 179 Wn. App. 464, 465, 318 P.3d 296, *review denied*, 180 Wn.2d 1019 (2014). In *State v. Meggyesy*, Division One held that a "to convict" instruction informing the jury it had a duty to

8

find the defendant guilty if the State proved the elements of the charged crime beyond a reasonable doubt did not infringe on the right to trial by jury under the state or federal constitutions. 90 Wn. App. 693, 958 P.2d 319 (1998), *abrogated on other grounds by State v. Rucuenco*, 154 Wn.2d 156, 110 P.3d 188 (2005), *reversed by Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006). Our opinions in *State v. Bonisisio* , and *State v. Brown* agreed with the reasoning of the *Meggyesy* court. 92 Wn. App. 783, 964 P.2d 1222 (1998); 130 Wn. App. 767, 124 P.3d 663 (2005). Division One has subsequently reaffirmed *Meggyesy* in *Moore* and Division Three of our court followed the reasoning of *Brown* and *Meggyesy* in *State v. Wilson*, 176 Wn. App. 147, 307 P.3d 823 (2013), *review denied*, 179 Wn.2d 1012 (2014). We adhere to this precedent. The "to convict" instructions did not infringe on Booth's right to a jury trial, and the trial court did not err in giving them.

## II. SUFFICIENCY OF THE EVIDENCE

Booth also alleges that the State failed to present sufficient evidence of attempted first degree extortion. Booth contends that the State elected to try him on only one of the theories of extortion, that he communicated a threat of bodily injury to West, and that the evidence presented at trial did not necessarily support only this theory of Booth's attempts to procure money from West. We disagree.

Due process of law requires the State to prove every element of a charged crime beyond a reasonable doubt in order to obtain a criminal conviction. *State v. O'Hara*, 167 Wn.2d 91, 105, 217 P.3d 756 (2009) (citing U.S. CONST. amend. XIV; WASH. CONST. art. I, § 22; *Jackson v. Virginia*, 443 U.S. 307, 311, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *In re Winship*, 397 U.S. 358, 365-66, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)). We review whether the State presented

9

evidence sufficient to satisfy this burden by examining whether, when viewed in the light most favorable to the State, a rational trier of fact could find the State had proven each of the elements beyond a reasonable doubt. *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009). By making his sufficiency challenge, Booth "'admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom.'" *State v. Kintz*, 169 Wn.2d 537, 551, 238 P.3d 470 (2010) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). Further, the law does not distinguish between direct and circumstantial evidence in determining the sufficiency of the evidence; circumstantial evidence may also support a conviction. *Kintz*, 169 Wn.2d at 551.

The State charged Booth with attempted first degree extortion. A person commits extortion by "knowingly . . . obtain[ing] or attempt[ing] to obtain by threat property or services of the owner." RCW 9A.56.110(1). A person may commit first degree extortion by "commit[ting] extortion by means" of one of three types of threat. RCW 9A.56.120. The trial court instructed the jury on only one of these means, that Booth attempted extortion by communicating to West threats about his future personal safety or the safety of some other person or persons. Under RCW 9A.28.020, a person attempts to commit a crime if, with the specific intent of committing that crime, he or she takes a substantial step toward the commission of the crime. The jury could readily have concluded that the State proved beyond a reasonable doubt that Booth took a substantial step toward obtaining West's property by threat. The testimony described Booth's collection of debts on Russell's behalf in the time before the murders. Witnesses described Booth's multiple attempts to collect one of these debts from West and West's desperation to obtain money the day of the murders, going so far as to offer to sell his

10

boat for a large discount to raise funds. Lindberg testified that West showed Booth pictures of his truck just after Booth arrived at West's house the night of the murders.

The jury could also have readily concluded that the State proved beyond a reasonable doubt that Booth communicated to West threats of harm to West or others if he did not pay his debt. Booth himself offered testimony that he collected debts with violence, agreeing that "[his] line of work [wa]s assaulting people" and that "when [he was] around [people] pa[id] their debts." VRP (Dec. 14, 2011) at 68, 85. West's daughter and son-in-law described Booth's unnerving questions about their children during his first visit and how West uncharacteristically ordered her to leave immediately afterwards. Just after seeing pictures of West's truck on the night of the murders, Booth and West went outside for a private conversation. Although West appeared calm when stepping outside, he returned in a state of agitation. This agitation led West to grab a shotgun in an attempt to expel Booth from his house. A rational jury could infer from this evidence, direct and circumstantial, that Booth threatened West or members of West's family with physical harm unless West paid the debt he owed. We affirm.

### III. THE PRIVACY ACT

Booth next contends that the State violated the Privacy Act by recording and listening to the phone call he made to Zacher from the Lewis County Jail, which led to the discovery of the murder weapon. Booth claims that the admission of the murder weapon violated RCW 9.73.050, which requires the exclusion of "[a]ny information obtained in violation of RCW 9.73.030," which forbids the interception or recording of private communications. We disagree with Booth based on well-settled case law concerning the use of jail phones.

11

RCW 9.73.030(1)(a) forbids public or private persons or entities from intercepting or recording any "[p]rivate communication transmitted by telephone . . . without first obtaining the consent of all the participants in the communication." Although the Privacy Act does not define a private communication, under Washington common law "'[a] communication is private (1) when parties manifest a subjective intention that it be private and (2) where that expectation is reasonable.'" *State v. Modica*, 164 Wn.2d 83, 88, 186 P.3d 1062 (2008) (quoting *State v. Christensen*, 153 Wn.2d 186, 193, 102 P.3d 789 (2004)) (alteration in original).

*Modica* is exactly on point here. In that case a man jailed awaiting trial for domestic violence made daily phone calls to his grandmother using the jail's phone system. *Modica*, 164 Wn.2d at 86. Signs in the jail warned inmates that the system recorded every outgoing call. *Modica*, 164 Wn.2d at 86. All participants to the calls heard a recorded warning that the State recorded all calls and could monitor those calls at any time. *Modica*, 164 Wn.2d at 86. Modica used his calls to his grandmother to "enlist[]" her "help in arranging for his wife to evade the prosecutors and not appear in court." *Modica*, 164 Wn.2d at 87. When Modica's wife ceased cooperating with the State and disregarded a subpoena, the State listened to the recordings of his calls and charged him with witness tampering based on statements he made in them. *Modica*, 164 Wn.2d at 87. Modica appealed his conviction for witness tampering, claiming that the trial court should have suppressed the recordings under the Privacy Act. *Modica*, 164 Wn.2d at 87.

Our Supreme Court affirmed the decision to admit the tapes. The Supreme Court assumed, but did not decide, that Modica and his grandmother manifested a subjective intent that the conversations remain private. *Modica*, 168 Wn.2d at 88. However, the Supreme Court held that Modica had no reasonable expectation of privacy in the calls for two reasons. First, it noted

12

that "because of the need for jail security," those incarcerated in jails have reduced expectations of privacy. *Modica*, 168 Wn.2d at 88, 89. Second, the court noted that the signs and recorded warnings alerted Modica and his grandmother to the fact that the State might listen to their conversation, further reducing any expectation of privacy. *Modica*, 168 Wn.2d at 88. The Supreme Court held, based on these considerations, that Modica had no objectively reasonable expectation of privacy in his calls and that the Privacy Act offered no protection to the conversations. *Modica*, 168 Wn.2d at 89, 90.

Like Modica, Booth awaited trial in jail. Like Modica, Booth had no reasonable expectation of privacy in his jail phone calls, even if we assume he subjectively intended those conversations to remain private. The same security concerns that diminished Modica's expectation of privacy diminished Booth's. Further, just as in *Modica*, signs at the prison and recorded warnings before the phone system connected the calls warned Booth that the State might monitor any conversations.

Booth attempts to distinguish *Modica* on the grounds that the phone system there alerted individuals that they *would* be recorded, whereas here the phone system merely stated that the State *might* record any conversation. This is a distinction without any meaningful difference. The State had informed Booth that it could listen, and Booth had no way of knowing that it was not doing so. Under those circumstances, Booth had no reasonable expectation of privacy in the calls from jail. Therefore, the Privacy Act does not prohibit admitting the tape of the call or the evidence ultimately discovered due to its content.

Booth also claims that the State violated a "court order" resulting from the notice of appearance filed by his original counsel in this case. That notice ordered the State not to attempt

13

to contact Booth, question him, or otherwise gather evidence from him without the presence of his attorney. The "order" merely asserted Booth's right to counsel in the face of custodial interrogation. It did not preclude the police from attempting to gather evidence in lawful ways other than through interrogation. *Maine v. Moulton*, 474 U.S. 159, 176, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985). Further, we interpret court orders to give effect to the issuing court's intent. *Hill v. Hill*, 3 Wn. App. 783, 786, 477 P.2d 931 (1970), *overruled on other grounds by Stokes v. Polly*, 145 Wn.2d 341, 37 P.3d 1211 (2001). Here, the issuing court specifically allowed the recording of Booth's phone calls in his first appearance and before he made the call disclosing the location of the gun. Under both its text and purpose, the claimed court order did not prohibit the recording of Booth's calls from jail.

## IV. PROSECUTORIAL MISCONDUCT

Booth also alleges that the prosecutor committed misconduct by asking him about his failure to produce alibi witnesses. With his first question on cross-examination, the prosecutor asked, "Well, you didn't bring anybody with you today to verify your alibi, right?" VRP (Dec. 14, 2011) at 68. Later the prosecutor mentioned that Booth's failure to name the people engaged in the drug trade with him prevented the jury from hearing corroborating testimony. The prosecutor then asked repeatedly about the man Booth referred to as "Joe Mama" or "Joe Nameless," and specifically asked whether Booth was refusing to identify his alibi witnesses. We hold that the prosecutor's questions constituted misconduct, but affirm Booth's conviction because he has not shown that the misconduct prejudiced him.

A criminal defendant alleging misconduct by the prosecutor bears the burden of showing the prosecutor acted improperly and that the misconduct was prejudicial. *State v. Emery*, 174

14

Wn.2d 741, 756, 278 P.3d 653 (2012). Where the defendant fails to object to the alleged misconduct at trial,

> the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. Under this heightened standard, the defendant must show that (1) no curative instruction would have obviated any prejudicial effect on the jury and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury verdict.

*Emery*, 174 Wn.2d at 760-61 (internal citations and quotation marks omitted).

We turn first to the threshold question of whether the prosecutor acted improperly. Because of the defendant's right to silence and the State's due process burden of proving every element of a charged crime, a criminal defendant need not present evidence, and a prosecutor typically commits misconduct by suggesting otherwise. *State v. Cheatham*, 150 Wn.2d 626, 652, 81 P.3d 830 (2003). However, in limited circumstances the missing witness doctrine allows a prosecutor to comment on the defense's failure to call a natural alibi witness without committing misconduct.[4] *Cheatham*, 150 Wn.2d at 652. A prosecutor may invoke the missing witness doctrine where (1) the missing witness's "testimony is material and not cumulative," (2) "the missing witness is particularly under the control of the defendant" and not equally available to the State, (3) the missing "witness's absence is not satisfactorily explained," and (4) invocation of the doctrine does not "infringe on a criminal defendant's right to silence or shift the burden of proof." *State v. Montgomery*, 163 Wn.2d 577, 598-99, 183 P.3d 267 (2008) (citation omitted).

---

[4] Normally the missing witness doctrine is invoked in a prosecutor's arguments rather than by his or her questions. *E.g.*, *Cheatham*, 150 Wn.2d at 652. However, the prosecutor's questions here served the same purposes as closing argument about a missing witness, and the limits on the doctrine should apply to the questions as well. *Cf. State v. Fricks*, 91 Wn.2d 391, 396, 588 P.2d 1328 (1979).

The prosecutor attempted to invoke the missing witness doctrine by asking about Booth's failure to call witnesses that would corroborate his alibi. In doing so, he acted improperly. As noted, a prosecutor may only invoke the doctrine if the missing witness's absence lacks satisfactory explanation. Where the missing witness would incriminate himself or herself through testimony, the witness's absence is satisfactorily explained by the privilege against self-incrimination. *State v. Blair*, 117 Wn.2d 479, 489-90, 816 P.2d 718 (1991). Booth testified that he went to West's house with his friend, whom he alternately gave the names "Joe Nameless" and "Joe Mama." Booth stated that he left "Joe" there to collect the money West owed to Booth and went about other business. VRP (Dec. 14, 2011) at 63-64. According to Booth, "Joe" later admitted shooting Salts and killing the Wests and Williams. VRP (Dec. 14, 2011) at 65. "Joe" would, therefore, have incriminated himself by testifying to confirm Booth's alibi, precluding the prosecutor's invocation of the missing witness doctrine. Consequently, the prosecutor committed misconduct by asking Booth about his failure to produce alibi witnesses.

The prosecutor's conduct does not, however, warrant reversal of Booth's convictions. Booth failed to object at trial. Consequently, reversal requires him to demonstrate that the misconduct was so flagrant and ill intentioned that a curative instruction would not have obviated any prejudice caused by the prosecutor's questions. *Emery*, 174 Wn.2d at 760-61. As noted, under this standard the defendant must show that

> (1) no curative instruction would have obviated any prejudicial effect on the jury and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury verdict.

*Emery*, 174 Wn.2d at 760-61 (citation omitted). Booth's claim fails under both of these requirements. First, a curative instruction can remedy a prosecutor's comment on the

16

defendant's failure to produce witnesses that he or she claims will corroborate his or her alibi. *State v. Fowler*, 114 Wn.2d 59, 66, 785 P.2d 808 (1990), *overruled on other grounds by Blair*, 117 Wn.2d at 479. Booth does not show that such an instruction would have failed to cure any prejudice from the prosecutor's misconduct. Second, the State presented strong evidence of Booth's guilt. Lindberg and Salts both implicated Booth as the murderer and as the person who shot Salts. Police found the murder weapon, which had only his genetic material on it, in the house where he hid after fleeing Lewis County in the wake of the murders, and he confessed to killing West to a friend. Given this overwhelming evidence of his guilt, we cannot say that the prosecutor's questions affected the jury's decision to find Booth guilty. For these reasons, Booth's misconduct claim does not warrant reversal.

## V. RIGHT TO COUNSEL

Booth next claims that the trial court erred in removing James Dixon, one of his appointed attorneys, after the State declined to seek the death penalty. He claims that the removal interfered with his constitutional right to counsel, violated statutes and rules governing the appointment of counsel, and was contrary to principles of equity. We review a trial court's decision regarding the removal of counsel for an abuse of discretion and find none here. *State v. Varga*, 151 Wn.2d 179, 200, 86 P.3d 139 (2004).

A.    Constitutional Right to Counsel

Both "[t]he Sixth Amendment to the United States Constitution and article I, section 22 (amendment 10) of the Washington State Constitution secure to all, by appointment if necessary, the right to assistance of counsel at any critical state in a criminal prosecution." *State v. Roberts*, 142 Wn.2d 471, 515, 14 P.3d 713 (2000). This appointment of counsel ensures a functioning

17

adversarial process and guarantees a fair trial for the criminal defendant. *Roberts*, 142 Wn.2d at 515 (citing *Wheat v. United States*, 486 U.S. 153, 158-59, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988)). A trial court's arbitrary and unjustifiable removal of counsel over the defendant's objections denies the defendant his or her right to counsel and constitutes a structural constitutional error. *See Roberts*, 142 Wn.2d at 515-16; *Harling v. United States*, 387 A.2d 1101, 1105-06 (D.C. 1978). In the circumstances presented, we find no denial of the right to counsel for three reasons.

First, the cases Booth cites, holding that a trial court denies the right to counsel by removing counsel arbitrarily after the attorney-client relationship has formed, are not apposite. Each of those cases involved a trial court removing the defendant's sole attorney after the defendant formed a relationship of "trust and confidence" with counsel. *See, e.g., Smith v. Superior Court of Los Angeles County*, 68 Cal.2d 547, 561, 440 P.2d 65 (1968). A trial court's decision to disrupt this relationship raises concerns that the defendant will not have a similar bond with replacement counsel and that this could impair the adversarial process. *Smith*, 68 Cal.2d at 561. The very possibility that the adversarial process will break down immunizes these types of claims from harmless error review. *Harling*, 387 A.2d at 1106. Here, while the trial court did remove Dixon, Dixon was not Booth's sole representative. Roger Hunko, Dixon's co-counsel, continued to represent Booth, and the record contains statements that Booth and Hunko shared a bond of trust. Booth's case, therefore, does not implicate the rationale behind cases like *Harling* and *Smith*, since Booth's continuing relationship with Hunko ensured a functional adversarial process at all times during the State's prosecution of Booth.

Second, Booth's right to counsel only prevented the trial court from "arbitrar[ily]" removing Dixon over his objections. *See Roberts*, 142 Wn.2d at 516; *Harling*, 387 A.2d at 1101. The trial court here did not act in an arbitrary manner. Washington provides for special procedures in cases where the defendant faces the death penalty. SPRC 1(a). One of these rules requires the trial court to appoint two attorneys to represent defendants facing the possibility of the death penalty. SPRC 2. The trial court appointed both Dixon and Hunko to comply with this rule. However, the death penalty rules "do not apply in any case in which imposition of the death penalty is no longer possible." SPRC 1(a). Reflecting this, the rule requiring the appointment of multiple attorneys provides, in its associated comment, that where a defendant no longer faces the death penalty, "the court may then reduce the number of attorneys to one to proceed with the murder trial." SPRC 2, at cmt. The trial court acted within the letter and consistently with the purpose of these rules. It did not act arbitrarily or unjustifiably.

Third, the state and federal constitutions do not require the trial court to provide the services of a particular attorney. *Roberts*, 142 Wn.2d at 516. The trial court appears to have removed Dixon because of concerns about paying for two attorneys to represent Booth in a nondeath penalty case. Booth essentially demanded representation by a specific attorney that Lewis County, paying on his behalf, could not afford. Booth's right to counsel does not require compliance with this demand.

B.     Statutory and RPC-based Right to Counsel

Booth also alleges that the trial court's removal of Dixon violated statutory and rule-based authority governing the appointment of counsel. He contends that each of these authorities

19

limit the removal of counsel to the circumstances provided for in the contract governing the appointment. We reject Booth's argument for three reasons.

First, the contracts are not in the record, so we cannot say that they did not provide the trial court with the authority to do exactly what it did. Thus, we cannot grant Booth relief. *See State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995) (a defendant cannot obtain relief based on matters outside the trial record in a direct appeal and must instead seek relief through a personal restraint petition).

Second, the authority Booth cites provides that the trial court shall have the authority to remove counsel for "good cause." *E.g.*, WSBA STANDARDS FOR INDIGENT DEFENSE, Standard 16. The State's decision to decline to seek the death penalty served as good cause in removing one of the two attorneys appointed under SPRC 2 and its associated comment.

Finally, RPC 1.8(f), cited by Booth, concerns conflicts of interest rather than the removal of counsel. Therefore this rule offers no support for his position. We find no violation of Booth's statutory or rule-based right to appointed counsel.

C.    Equitable Right to Counsel

Booth next claims that "[t]he rules of [e]quity" required the trial court to retain Dixon as one of his trial attorneys. Br. of Appellant at 14. Booth claims that the State's use of multiple attorneys to prosecute him entitled him to have multiple attorneys represent him. We find his argument without merit. Booth shows no equitable source of a right to counsel. As we explained above, Hunko continued to represent Booth and this satisfied the constitutional mandate that he receive counsel. Booth alleges that he was deprived of his constitutional right to counsel by Hunko's ineffectiveness, but he does not even begin to explain how Hunko failed him

and a review of the record does not show any deficient performance that prejudiced Booth, given the strength of the State's case against him. *McFarland*, 127 Wn.2d at 334-35 (defendant must show deficient performance and resulting prejudice for relief on an ineffective assistance of counsel claim).

## VI. LEGAL FINANCIAL OBLIGATIONS (LFOS)

Finally, Booth alleges that the trial court's order of restitution amounts to cruel and unusual punishment because he will never have the means to pay it.

Both the state and federal constitutions forbid the imposition of excessive fines or cruel punishment. U.S. CONST. amend VIII; WASH. CONST. art. I, § 14. The due process clause of the Fourteenth Amendment also regulates, in some circumstances, the imposition of financial obligations on indigent criminal defendants. *E.g.*, *State v. Blank*, 131 Wn.2d 230, 241, 930 P.2d 1213 (1997) (citing *Bearden v. Georgia*, 461 U.S. 660, 667-68, 103 S. Ct. 2064, 76 L. Ed. 2d 221 (1983)).

Booth first challenges the sufficiency of the trial court's findings related to the imposition of his LFOs. Booth contends that we must vacate the LFO order for lack of the "specific factual findings" necessary to impose fines. Br. of Appellant at 18. He is mistaken.

By statute, the trial court had no discretion in requiring him to pay for the victim assessment, the DNA (deoxyribonucleic acid) collection fee, or restitution to the crime victim's compensation fund. CP at 639, 654; *State v. Lundy*, 176 Wn. App. 96, 102-03, 308 P.3d 755 (2013); RCW 7.68.035; RCW 43.43.7541; RCW 9.94A.753. A trial court's findings are irrelevant to the necessity of imposing these LFOs. *Lundy*, 176 Wn. App. at 103.

Turning to the discretionary LFOs the trial court imposed, which includes court and other costs, the court incorporated language about consideration of Booth's ability to pay in the judgment and sentence, which serves as a finding applicable to these LFOs. We review this finding in the judgment and sentence under the clearly erroneous standard. *Lundy*, 176 Wn. App. at 105 & n.7. The record here shows that the trial court found the LFOs appropriate based on Booth's young age, health, and consequent possibility of getting a prison job. Given that Booth bore the burden of demonstrating his indigence "would extend indefinitely," we cannot say that the trial court's finding was clearly erroneous. *Lundy*, 176 Wn. App. at 107-08.

Further, challenges to LFOs based on indigence are not ripe for review "until the State attempts to curtail a defendant's liberty by enforcing them." *Lundy*, 176 Wn. App. at 108. Neither the imposition of LFOs in Booth's judgment and sentence nor the restitution order he appeals, in and of themselves, curtail his liberty. That may occur, if at all, only as part of the process to compel payment of his obligations. At that point, Booth may challenge the collection of LFOs, and a court will have to determine whether the State has attempted to force Booth to pay his obligations in spite of his indigence. At that point, his challenge will be ripe for review. *Lundy*, 176 Wn. App. at 109; *State v. Bertrand*, 165 Wn. App. 393, 405, 267 P.3d 511 (2011), *review denied*, 175 Wn.2d 1014 (2012). As Booth has not offered any evidence that the State has attempted to compel payment, we decline to address Booth's challenge to the LFO orders at this time.

22

No. 42919-5-II

CONCLUSION

We reaffirm our precedent and hold that the "to convict" instructions given here comported with the state and federal constitutions. We reject Booth's other contentions and affirm his conviction. We do not reach the merits of his challenge to the LFO order, because it is not ripe for review.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

BJORGEN, A.C.J.

We concur:

MAXA, J.

LEE, J.

23