
# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>CLARENCE HERMAN WRIGHT, III,<br><br>Appellant. | No. 72608-1-I<br>(Consolidated with No. 73300-1-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED<br><br>FILED: April 18, 2016 |

Cox, J. – Following an attempted armed home invasion, a jury found Clarence Wright guilty of burglary in the first degree and two counts of assault in the first degree. The trial court determined that Wright was a persistent offender and sentenced him to life imprisonment without the possibility of parole.

On appeal, we conclude that the trial court did not abuse its discretion in admitting evidence of Wright's recent participation in an uncharged attempted robbery. We also reject Wright's claims that the State committed prejudicial misconduct and that the trial court erred in sentencing him as a persistent offender. Wright's statement of additional grounds raises no meritorious issues. Accordingly, we affirm.

During the early morning hours of February 11, 2013, Jay Tillman was sleeping on a couch in a Tukwila apartment when he was awakened by a knock

at the door. Jay[1] got up to investigate and looked through the peep hole. Believing the person he saw might be an upstairs neighbor, he opened the door slightly. The man outside, later identified as Clarence Wright, immediately thrust a revolver through the opening.

Terrified, Jay grabbed the gun and attempted to block the entrance. During the ensuing struggle, both men held on to the gun. Wright eventually pushed Jay back over a couch. As Jay fell, Wright fired the gun, striking him in the abdomen. Jay continued to hold on to the gun.

Nathanial Tillman, Jay's 20-year-old son, was awakened by his mother's screams and the sounds of gunfire. He came out of his bedroom and saw Jay and Wright struggling with the gun. As Nathanial attempted to help his father by placing Wright in a headlock, Wright shot him in the thigh.

At some point, Jay managed to seize the gun from Wright and fired it, striking Wright in the shoulder. At this point, Wright stumbled back out of the apartment and disappeared into an apartment complex across the street. Wright did not say anything during the incident except "Why did you bite me" when Nathanial bit him in the forehead. None of the apartment's occupants had ever met Wright.

Mary Tillman, Jay's wife, called 911. With the assistance of a K-9 unit, Tukwila police officers arrested Wright a short time later. Officers recovered

---

[1] Where necessary for clarity, we use the witnesses' first names.

Wright's gun from the Tillmans' apartment and the gloves that he abandoned during the pursuit.

The State charged Wright with one count of burglary in the first degree, two counts of assault in the first degree, and one count of unlawful possession of a firearm in the first degree. The trial court severed the firearm count for trial.

Shortly after Wright's arrest, Tukwila investigators learned that he was the subject of a California arrest warrant for the attempted robbery of a cell phone store in San Rafael on January 19, 2013. During the incident, an armed man entered the store, pointed a handgun at the employees, and demanded money. The suspect fired the gun once in the general direction of the employees before running off without obtaining any money.

On February 12, 2013, City of San Rafael Police Department Detective Todd Berringer interviewed Wright at the King County Jail. After being advised of his Miranda[2] rights, Wright admitted that he had committed the attempted robbery in San Rafael. He explained that he was trying to get money to visit his daughter in Seattle and to buy her some shoes. Wright said he fired the gun to stop the store employees from fleeing and acknowledged that the gun he used was the same gun he used during the Tukwila incident.

During an interview with Tukwila police officers, Wright said he had been drinking gin all afternoon before going to the Tillmans' apartment. Wright claimed that he did not know why he was at the apartment and could recall only that "he

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

was put in a headlock, and that somebody was punching him and somebody shot him." Notwithstanding his contrary statement to Detective Todd Berringer, he denied having a gun during the Tukwila incident. He also denied having gloves.

At trial, Wright raised a defense of diminished capacity. Dr. Craig Beaver, a clinical psychologist, conducted a forensic neurological evaluation of Wright. Dr. Beaver diagnosed Wright with dementia secondary to a traumatic brain injury that he suffered in September 2012. Dr. Beaver concluded that as a result of brain damage and intoxication, Wright lacked the capacity to form criminal intent during the Tillman incident.

In rebuttal, the State presented the testimony of Dr. Ray Hendrickson, a forensic psychologist. Dr. Hendrickson disputed Dr. Beaver's testimony that Wright's dementia affected his capacity to form intent and that Wright's intoxication was sufficiently severe as to interfere with his ability to function. In Dr. Hendrickson's opinion, Wright's actions during the home invasion, including his flight after being shot and his attempts to hide from the police, reflected deliberate, goal-driven behavior rather than a lack of capacity to form the requisite intent.

The State also introduced two recordings of telephone calls that Wright made in jail while awaiting trial. In one of the recordings, Wright told a woman that future calls might be monitored so that "if I sound a little off just go along with the flow." In another recording, Wright indicated he was planning to assist in his defense by "playing I am crazy."

The jury found Wright guilty as charged. The trial court found Wright was a persistent offender and sentenced him to life imprisonment without the possibility of parole.

## ER 404(b)

Over defense objections, the trial court ruled that the State could present evidence of the attempted robbery in California. The court concluded that the evidence was admissible as res gestae, common scheme or plan, and intent under ER 404(b) and that the probative value outweighed the potential for unfair prejudice. Wright argues that the evidence failed to satisfy the requirements of ER 404(b) and merely constituted inadmissible evidence of a propensity to commit crimes.

Under ER 404(b), evidence of prior misconduct is not admissible "to show that it is likely the defendant committed the alleged crime, acted in conformity with the prior bad acts when committing the crime, or had a propensity to commit the crime."[3] Such evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[4] Before admitting evidence of prior misconduct under ER 404(b), the trial court must (1) find by a preponderance of the evidence that the misconduct occurred; (2) identify the purpose for admitting the evidence; (3) determine the relevance of the evidence to prove an element of

---

[3] State v. Wilson, 144 Wn. App. 166, 175, 181 P.3d 887 (2008).
[4] ER 404(b).

the charged crime; and (4) weigh the probative value against its prejudicial effect.[5] We review the trial court's decision to admit or exclude evidence under ER 404(b) for an abuse of discretion.[6]

Prior misconduct may be admissible as res gestae evidence "[t]o complete the story of the crime on trial by proving its immediate context of happenings near in time and place."[7] If another offense constitutes a "'link in the chain' of an unbroken sequence of events surrounding the charged offense, evidence of that offense is admissible 'in order that a complete picture be depicted for the jury.'"[8]

Wright asserts that the California attempted robbery was not res gestae evidence because it did not occur within the "immediate context" of the Tukwila offense. But contrary to Wright's assertion, the California incident did not occur two months before the current charge, but rather about three weeks. Wright told Det. Berringer that he tried to rob the cell phone store on January 18, 2013, to obtain money to visit his daughter in Seattle and buy her presents. Under the circumstances, the unsuccessful attempted robbery in San Rafael provided specific contextual information about Wright's presence in the Seattle area and his otherwise unexplained armed invasion of the Tillmans' apartment shortly after arriving in the area. The trial court did not abuse its discretion in admitting the California robbery as res gestae evidence.

---

[5] State v. Gresham, 173 Wn.2d 405, 421, 269 P.3d 207 (2012).
[6] State v. Fisher, 165 Wn.2d 727, 745, 202 P.3d 937 (2009).
[7] State v. Powell, 126 Wn.2d 244, 263, 893 P.2d 615 (1995) (citations omitted).
[8] State v. Brown, 132 Wn.2d 529, 571, 940 P.2d 546 (1997) (quoting State v. Tharp, 96 Wn.2d 591, 594, 637 P.2d 961 (1981)).

We also agree that the trial court did not abuse its discretion in admitting the San Rafael incident as evidence of a common scheme or plan. In order to constitute a common scheme or plan, the evidence of the prior misconduct and the charged crime "must demonstrate not merely similarity in results, but such occurrence of common features that the various acts are naturally to be explained as caused by a general plan of which the charged crime and the prior misconduct are the individual manifestations."[9]

Wright barged into both the cell phone store and the Tukwila apartment brandishing a revolver. In both incidents, he was wearing similar clothing, including a hoodie and cap intended to conceal his identity. He also wore a glove on the hand that held the firearm. Wright expressly demanded money in the San Rafael incident, but said nothing about his intentions during the Tukwila incident. But the occupants of the apartment physically confronted Wright almost immediately, requiring him to struggle over possession of the gun. In both incidents, Wright fired the revolver shortly after entry.

Despite some differences, the similarities were sufficient to support a reasonable determination that the incidents were "individual manifestations" of the same plan.[10] Evidence admitted to show a common scheme or plan need not be "distinct from common means of committing the charged crime."[11]

---

[9] State v. DeVincentis, 150 Wn.2d 11, 19, 74 P.3d 119 (2003) (quoting State v. Lough, 125 Wn.2d 847, 860, 889 P.2d 487 (1995)).
[10] Gresham, 173 Wn.2d at 423.
[11] Id.

Finally, even if admission of the attempted robbery was erroneous for purposes of res gestae or common scheme or plan, the trial court did not abuse its discretion in admitting the evidence to prove intent and to rebut Wright's diminished capacity defense. "When the State offers evidence of prior acts to demonstrate intent, there must be a logical theory, other than propensity, demonstrating how the prior acts connect to the intent required to commit the charged offense."[12]

Wright admitted that he had attempted to rob the cell phone store and that he intentionally fired the gun to stop the employees from fleeing. Wright also explained the specific purpose for obtaining money. Evidence of Wright's actions less than one month before the current offense tended to rebut his claim that a September 2012 head injury rendered him incapable of forming criminal intent.[13]

## PROSECUTORIAL MISCONDUCT

Wright contends that prosecutorial misconduct during the cross examination of Dr. Beaver, the defense's expert witness on diminished capacity, violated his right to a fair trial. He argues that the deputy prosecutors improperly asked Dr. Beaver whether Wright was "lying" and expressed personal opinions about Wright's credibility and his guilt.

---

[12] State v. Wade, 98 Wn. App. 328, 334, 989 P.2d 576 (1999) (emphasis in original).
[13] See State v. Medrano, 80 Wn. App. 108, 113, 906 P.2d 982 (1995) (as "a matter of logical probability," evidence of a prior criminal offense requiring intent makes it "less likely that [the defendant] could not form the requisite intent for the current burglary").

During cross examination about the thoroughness of his review of Wright's inconsistent statements about the Tillman incident, Dr. Beaver acknowledged that he "could have asked [Wright] more questions," but thought that "things had been covered." The deputy prosecutor then continued:

> Q. Okay. Even though it's patently obvious from the statement that the defendant gave to these separate statements [sic], that he is lying, he says he doesn't have a gun, he does have a gun, he was hiding, he wasn't hiding, you had all that information when you were interviewing him?
>
> A. I'm sorry, you said he was just patently lying?
>
> Q. Sometimes he remembers what happens, sometimes he doesn't. When he does remember a fact, he has a different interpretation for what occurred, or it didn't occur.[14]

Defense counsel did not object to the reference to "lying," but later objected on the basis that the deputy prosecutor was "badgering" the witness. The trial court overruled the objection.

On the following day, a different deputy prosecutor questioned Dr. Beaver's expertise to conduct a 1987 workshop on neurological deficits. When Dr. Beaver acknowledged that his presentation also encompassed the effects of drugs and alcohol, the deputy prosecutor commented, "Yeah, I would like to see your class list on that."[15] The trial court overruled defense counsel's objection that the remark was an improper comment on the evidence.

---

[14] Report of Proceedings (Sept. 8, 2014) at 139 (emphasis added).
[15] Report of Proceedings (Sept. 9, 2014) at 17.

When the deputy prosecutor asked about similarities between the charged crime and the San Rafael incident, Dr. Beaver stated, "I don't see things that indicate that he was trying to rob someone."[16] The deputy prosecutor replied, "Okay. So that's a difference of opinion that the two of us have, we can work with that."[17] Defense counsel did not object.

Finally, Wright contends that the deputy prosecutor violated a pre-trial ruling by referring to Wright's 2002 conviction for unlawful possession of a firearm.

At the conclusion of Dr. Beaver's testimony, Wright moved for a mistrial. After reviewing the transcripts of the alleged misconduct, the trial court denied the motion. Wright renewed his challenge to the alleged misconduct in a motion for a new trial, which the trial court also denied.

A defendant claiming prosecutorial misconduct bears the burden of establishing that the challenged conduct was both improper and prejudicial.[18] When the defendant objects to alleged misconduct or moves for a mistrial, an appellate court accords the trial court deference because it is in the best position to assess potential prejudice.[19] Consequently, we review the trial court's rulings on alleged misconduct for an abuse of discretion and will overturn the court's decisions only if the defendant demonstrates a substantial likelihood that the

---

[16] Id. at 30.
[17] Id.
[18] State v. Cheatam, 150 Wn.2d 626, 652, 81 P.3d 830 (2003).
[19] State v. Stenson, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997).

alleged misconduct affected the verdict.[20] We assess alleged misconduct in the context of the total argument, the evidence addressed, the issues in the case, and the jury instructions.[21]

On appeal, Wright devotes almost no discussion to the context of the challenged comments. After Dr. Beaver asked whether the deputy prosecutor was saying that Wright was "patently lying," the deputy prosecutor immediately clarified the context:

> Q. Sometimes he remembers what happens, sometimes he doesn't. When he does remember a fact, he has a different interpretation for what occurred, or it didn't occur.[22]

The deputy prosecutor then continued to question Dr. Beaver about the inconsistent interviews Wright gave after his arrest.

The deputy prosecutor's references to a "class list" and a difference of opinion were irrelevant and snide. But contrary to Wright's assertions, the comments did not clearly communicate a comment on the evidence or a personal opinion on credibility. Moreover, in each instance, the deputy prosecutor did not pursue or repeat the comments and immediately moved on to proper questions. Similarly, after briefly mentioning the firearm conviction, the deputy prosecutor questioned Dr. Beaver about the specific facts underlying Wright's 2002 robbery convictions.

---

[20] See State v. Lindsay, 180 Wn.2d 423, 430-31, 326 P.3d 125 (2014); see also State v. Rodriguez, 146 Wn.2d 260, 269-70, 45 P.3d 541 (2002).
[21] State v. Pirtle, 127 Wn.2d 628, 672, 904 P.2d 245 (1995).
[22] Report of Proceedings (Sept. 8, 2014) at 139.

In summary, each of the alleged instances of misconduct involved a single, isolated reference. Several of the comments were too attenuated to clearly convey an improper personal opinion. The deputy prosecutor did not repeat the alleged improper remarks and immediately moved on to proper cross examination. The trial court also instructed the jury that "the lawyers' statements are not evidence."

Viewed in context, the challenged comments involved an extremely minor portion of an extensive cross examination that thoroughly challenged Dr. Beaver's opinion about Wright's capacity to form criminal intent. Under the circumstances, there is no reasonable likelihood that any improper comments affected the jury's assessment of Wright's diminished capacity defense or the outcome of the trial.

## PERSISTENT OFFENDER ACCOUNTABILITY ACT (POAA)

Wright contends that the POAA's classification of prior convictions as sentencing factors rather than additional elements of the crime violates his right to equal protection. He argues that there is no rational basis for requiring the State to prove prior convictions to a jury when they are an element of the crime, but allow judges to find some prior convictions by a preponderance of the evidence as "sentencing factors."

This court rejected an essentially identical argument in State v. Langstead:

> We conclude recidivists whose conduct is inherently culpable enough to incur a felony sanction are, as a group, rationally distinguishable from persons whose conduct is

-12-

felonious only if preceded by a prior conviction for the same or a similar offense. We reject Langstead's equal protection challenge.[23]

Wright has not addressed Langstead or presented any argument warranting reconsideration of our analysis. We therefore reject Wright's equal protection challenge.

Wright also contends that the State had to prove beyond a reasonable doubt his prior strike offenses to a jury before the court could sentence him as a persistent offender. Our supreme court rejected this contention in State v. Witherspoon:

> Accordingly, it is settled law in this state that the procedures of the POAA do not violate federal or state due process. Neither the federal nor state constitution requires that previous strike offenses be proved to a jury. Furthermore, the proper standard of proof for prior convictions is by a preponderance of the evidence.[24]

Witherspoon is binding on this court.[25]

## STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

In his statement of additional grounds for review, Wright asserts (1) the State delayed providing certain unidentified evidence to the defense; (2) the court reporter observed jurors speaking to a State witness; (3) he was called a liar numerous times, and (4) he was not allowed to take his "legal paper work" when he was transported to California.

---

[23] 155 Wn. App. 448, 456-57, 228 P.3d 799 (2010).
[24] 180 Wn.2d 875, 893, 329 P.3d 888 (2014).
[25] See State v. Gore, 101 Wn.2d 481, 487, 681 P.2d 227 (1984).

Because several of Wright's allegations involve matters that are outside the record, this court cannot address them on direct appeal.[26] The remaining allegations are too conclusory to permit judicial review.[27]

We affirm the judgment and sentence.

_Cox, J._

WE CONCUR:

_____

_____

---

[26] State v. McFarland, 127 Wn.2d 322, 337-38, 899 P.2d 1251 (1995).

[27] See RAP 10.10(c) (appellate court "will not consider a [defendant/appellant's] statement of additional grounds for review if it does not inform the court of the nature and occurrence of [the] alleged errors").