# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 74220-5-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GERMAN LOPEZ CASTRO, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: February 6, 2017 |
| | ) | |

VERELLEN, C.J. — A jury convicted German Lopez Castro of assaulting his estranged wife while armed with a deadly weapon and found he committed the offense within the sight and sound of their minor children. Lopez Castro seeks reversal, arguing the trial court erred in denying his motion for a mistrial related to an ex-girlfriend's testimony that Lopez Castro had assaulted her in the past. Given the strength of the State's case, the repeated limiting instructions, the phrasing of a juror's question during closing argument, the inconsistencies in the ex-girlfriend's testimony, and her impeachment on cross-examination, the limiting instruction cured the prejudicial effect of the ex-girlfriend's testimony. Therefore, we affirm.

## FACTS

The State initially charged Lopez Castro with one count of second degree assault while armed with a deadly weapon, alleging that on July 26, 2015, he threatened to "end it all" and pulled a knife on his estranged wife Stephanie Lopez

Castro.[1] Police arrested Lopez Castro when he left Stephanie's apartment and went out to the parking lot.

Following Lopez Castro's arrest, Stephanie spoke with Lopez Castro's then-girlfriend Tara Larue. Larue told Stephanie that six days earlier, on July 20, 2015, Lopez Castro forced Larue to go with him to Stephanie's apartment because he planned to kill Stephanie. Larue said they waited outside for Stephanie to leave for work, but Stephanie was not at home.

Before trial, the State amended the information to include one count of felony harassment while armed with a deadly weapon, occurring on or about July 20 through 26, 2015, and an additional aggravator for both counts because they were committed within the sight and sound of Stephanie and Lopez Castro's minor children. The State's theory was that the harassment charge could be based on either the "end it all" threat on July 26, or the threat to kill heard by Larue on July 20, which she later relayed to Stephanie.

At a pretrial hearing, the State sought to admit allegations by Stephanie and Larue that Lopez Castro previously abused both women. The State argued Stephanie's allegations were relevant to show the reasonableness of Stephanie's fear, an element of harassment. As to Larue's allegations, the State argued they were relevant to show why Larue did not contact the police after the July 20 incident.

The defense moved to exclude the allegations of prior abuse. It surmised the State could not prove any of the allegations. Nonetheless, the defense agreed Larue was expected "to testify that, on July 20th, she believed Mr. Lopez Castro was going

---

[1] For clarity, we will refer to Stephanie Lopez Castro by her first name.

2

to his wife's house and waiting . . . to kill her, that [Larue] then went to work and did nothing for the next six days."[2] The defense expected "to elicit testimony that [Larue] had Stephanie Lopez Castro's phone number" but "never contacted her."[3]

In a preliminary hearing, the trial court asked whether both sides wanted "to get into it?"[4] Defense counsel responded, "I think it's going to come out, just to be perfectly frank with the Court."[5] The court clarified:

> Very well. As to what Stephanie will be able to say, Stephanie's allegations, if I find that they have been proved by a preponderance, are relevant and admissible on Count 2 [the harassment charge].
>
> Ms. Larue's allegations—again, if I find that by a preponderance that the allegations are correct—are likewise relevant and admissible in order to explain a subject that both sides want to get into, which is that Ms. Larue did not tell Stephanie nor the police nor take any action whatsoever, apparently, for about five days after an alleged incident in which the defendant said that he was going to kill Stephanie in front of the children.[6]

Both Stephanie and Larue testified at the ER 404(b) hearing.[7] Larue testified that around 5:00 a.m. on July 20, 2015, Lopez Castro told her "to get out of bed" and that she "needed to go with him right then."[8] Lopez Castro said, "We're going to go to Stephy's house. Nobody calls the cops on me. I'm going to kill that bitch."[9] Larue

---

[2] Report of Proceedings (RP) (Oct. 12, 2015) at 18-19.

[3] Id. at 19.

[4] Id.

[5] Id.

[6] Id. at 19-20.

[7] Lopez Castro does not challenge the admission of Stephanie's allegations.

[8] RP (Oct. 13, 2015) at 120.

[9] Id. at 120.

and Lopez Castro then went to Stephanie's home. Lopez Castro wanted to wait for Stephanie to come outside so that he could kill or hurt her or their children "and see how that made her feel."[10] Lopez Castro brought Larue with him so she "could tell the cops when they came after he hurt [Stephanie] that he didn't do anything."[11] Larue did not report the incident to police because she did not have a phone and was concerned about having "to deal with the repercussions of not doing what [Lopez Castro] said."[12] Larue explained that she did not have a phone because Lopez Castro "made sure I didn't have a means of communication with anybody."[13]

Lopez Castro had been physical with Larue several times in the past. He had cracked her ribs, choked her, spit in her face, poured beer on her, and damaged her property. Lopez Castro also held a knife to Larue's throat on one occasion and kidnapped her from a public place by forcing her into his car. Larue never reported any of these incidents because "[t]hings could have probably gotten worse than what they already were."[14] Larue said Lopez Castro scared her. When asked to elaborate, Larue testified to Lopez Castro telling her "I wonder if your kids will come to your funeral after I kill you."[15]

---

[10] Id. at 121.

[11] Id. at 126.

[12] Id. at 121.

[13] Id. at 128.

[14] Id. at 123.

[15] Id. at 125.

4

The court found Larue's testimony about the July 20 incident relevant to show that Lopez Castro had a plan to threaten Stephanie "and an actual intent to do so."[16] It further found her testimony tended to explain why "Larue failed to notify the police" about the incident.[17] The court ruled that since both sides indicated they wanted to "get into" Larue's failure to report the incident, her fear of Lopez Castro and her reasons for fearing him were "all relevant" to explain why she did not call the police.[18]

When Larue testified at trial, the prosecutor began by asking questions about her relationship with Lopez Castro. Larue said that at first it was great, but that it changed. The prosecutor asked her how it changed, and Larue said they "started arguing a lot," and that Lopez Castro "would get physical" with her.[19] Defense counsel immediately objected: "I'm going to object at this point as the relevance of this testimony has not yet been established."[20] The court overruled the objection and allowed Larue to continue.

Larue testified that Lopez Castro pushed her in a room, strangled her, spit on her, and belittled her. Larue did not report any of these incidents because she "was worried about what would happen as a repercussion."[21] She explained that Lopez Castro had threatened her numerous times, asking if her children would come to her funeral and showing her videos of how she would die. The prosecutor then asked

---

[16] Id. at 147.

[17] Id. at 147.

[18] Id. at 147-48.

[19] Id. at 175.

[20] Id.

[21] Id. at 176.

5

Larue why she did not refuse to go with Lopez Castro to Stephanie's on July 20, and she explained, "I wasn't going to refuse to go with him. . . . [F]irst of all, it wasn't an option to say no to German ever. . . . [b]ecause he'd—repercussions. He wouldn't accept no. I just did what he said to keep myself safe."[22] When asked whether there was a reason she did not report the July 20 incident to police, Larue responded, "No. I, I just did what [Lopez Castro] told me. He took me back home. I went to work. I haven't had a phone [in] forever. He made sure I had no connection to anybody."[23]

Although Larue testified that she did not have a means of communication, she later testified that she texted Stephanie on July 19, 2015 from her roommate's phone. On cross-examination, Larue revealed that based on that text exchange she knew Stephanie was not at home on July 20, and that was the reason she did not call 911 to alert the police.

Later in her testimony, Larue stated Lopez Castro had threatened her in the past with a knife. She described the incident as "He just ran after me into a stairwell of my friend's apartment and put the knife on me there."[24] The prosecutor did not elicit any further details about the incident. On cross-examination, defense counsel brought out that Lopez Castro had held the knife to Larue's throat and then dropped it and began crying. Defense counsel also brought out that Larue did not call the police because she had warrants for her arrest.

---

[22] Id. at 185.

[23] Id. at 178.

[24] Id. at 184.

The following morning, the court held a hearing outside the presence of the jury to discuss the defense's proposed limiting instruction as to the ER 404(b) testimony. The court noted that it did not recall Larue testifying that the reason she did not report the July 20 incident to police was because of her fear of Lopez Castro, as she had testified in the ER 404(b) hearing. The court stated it therefore regretted overruling the defense's objection to the relevance of Larue's testimony about the prior abuse.

Although Larue testified about her fear of reporting any of the acts of abuse to police because of Lopez Castro's threats to kill her, Larue did not specifically state that her reason for not reporting the July 20 incident was because of fear.

The defense moved for a mistrial. The prosecutor opposed the mistrial and proposed instead that the trial court strike all of Larue's testimony about the prior abuse and instruct the jury to disregard it. The court acknowledged that in some cases striking the testimony would be pointless because "the testimony is so powerful that it would be too much to ask" that a jury "set aside what they know the testimony was."[25] It nonetheless determined that the jury could follow an instruction to disregard all of Larue's testimony about prior abuse, such that Lopez Castro "would be able to get a fair trial."[26] The court noted,

> [A] different situation would present itself if this evidence came out of nowhere . . . But we know that she has said this. She has said "I fear the defendant because of these things." It's not as though the evidence was unfairly obtained in any way. It's just that, having fairly obtained

---

[25] RP (Oct. 14, 2015) at 251.

[26] Id.

7

the evidence, the State was unable to see it recreated when the State needed it.[27]

The court then read, and repeated at defense counsel's request, the following instruction to the jury:

> You have heard evidence of unreported and uncorroborated allegations of prior physical contact between the defendant German Lopez Castro and both Stephanie Lopez Castro and Tara Larue. *You are to disregard all the evidence presented by Ms. Larue concerning allegations of prior physical contact between her and the defendant.*
>
> *I repeat, you are to disregard utterly all the evidence presented by Ms. Larue concerning allegations of prior physical contact between her and the defendant.*[28]

The court continued with the remainder of the instruction regarding Stephanie's testimony, which is not at issue here.

A.L.C., Stephanie and Lopez Castro's eldest daughter, testified about the July 26 incident. A.L.C., her two brothers and her cousin were at Stephanie's apartment when Stephanie and Lopez Castro began arguing. A.L.C. testified that Lopez Castro said he was going to "end it" and grabbed a big knife.[29] He held the knife up to a television in the kitchen. He then locked the front door, pushed Stephanie against the wall, and held the knife near her neck. A.L.C. testified that everyone in the apartment started screaming and it was then that Lopez Castro dropped the knife. A.L.C. picked up the knife to get it away from Lopez Castro because she thought he was going to hurt her mother. Lopez Castro grabbed the knife from A.L.C. and left

---

[27] Id. at 252.

[28] Id. at 260 (emphasis added).

[29] Id. at 303.

the apartment. A.L.C. identified the State's trial exhibit 8 as the knife Lopez Castro had grabbed.

Stephanie testified consistently with A.L.C.'s description of key aspects of the July 26 incident. Stephanie added that she told A.L.C. to call the police once Lopez Castro grabbed the knife. Stephanie testified that Lopez Castro "came towards me, [and] said, 'Yeah, call the cops so I can end it all.'"[30] Stephanie understood Lopez Castro's statement to mean "that he wanted to kill us and himself."[31] She believed his threat because he had told her on "previous occasions" that he wanted to "end it all, meaning kill me, my kids, and himself."[32] Stephanie described two incidents within the past year when Lopez Castro had choked her and threatened to jump off a balcony with her.

During closing argument, the prosecutor began by referencing all of the witnesses' testimony: "[Y]ou had an opportunity to hear from witnesses. You heard from Stephanie Lopez Castro; you heard from Tara Larue; and you also heard from [A.L.C.]."[33] One of the jurors immediately interrupted, asking, "Wasn't Tara Larue's testimony wiped from the records?"[34] At the request of both the prosecutor and defense counsel, the court then reread the limiting instruction to the jury.

---

[30] RP (Oct. 13, 2015) at 218.

[31] Id.

[32] Id. at 218-19.

[33] RP (Oct. 15, 2015) at 390.

[34] Id.

The jury found Lopez Castro guilty of second degree assault while armed with a deadly weapon and found that he committed the crime in front of the victim and his minor children. The jury acquitted him of the harassment charge.

Lopez Castro appeals.

## ANALYSIS

### Motion For Mistrial

Lopez Castro argues the trial court erred in denying his motion for a mistrial. We review a trial court's decision to deny a motion for mistrial for abuse of discretion.[35] A trial court abuses its discretion in denying a motion for a mistrial only if its decision is manifestly unreasonable or based on untenable grounds.[36]

A trial court has broad discretion to rule on irregularities during the course of a trial.[37] Determining whether an irregularity during trial is so prejudicial as to warrant a mistrial depends on (1) the seriousness of the irregularity, (2) whether the statement was cumulative of other properly admitted evidence, and (3) whether the irregularity could be cured by an instruction to disregard the remark.[38]

The trial court is in the best position to determine if a trial irregularity caused prejudice.[39] A mistrial should be granted "only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried

---

[35] State v. Jackson, 150 Wn.2d 251, 276, 76 P.3d 217 (2003).

[36] State v. Allen, 159 Wn.2d 1, 10, 147 P.3d 581 (2006) (quoting State v. Stenson, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997)).

[37] State v. Lewis, 130 Wn.2d 700, 707, 927 P.2d 235 (1996).

[38] State v. Perez-Valdez, 172 Wn.2d 808, 818, 265 P.3d 853 (2011).

[39] Id. at 819.

fairly."[40] We will reverse the trial court only if there is a substantial likelihood the trial irregularity affected the jury's verdict.[41]

Larue's testimony about Lopez Castro's prior acts of abuse towards her amounts to a significant trial irregularity. ER 404(b) embodies an express policy against the admission of evidence of prior crimes, wrongs, or acts except in very limited circumstances and for limited purposes. Although the purpose of Larue's testimony at trial was to explain why she did not report the July 20 incident to police, she never made the direct link that she did not report the incident because she was afraid of Lopez Castro, as she had in the ER 404(b) hearing. Moreover, although defense counsel elicited the testimony on cross-examination, Larue described an incident of prior abuse in which Lopez Castro held a knife to her throat, an allegation similar to Lopez Castro's assault charge here. Larue's testimony was not cumulative or repetitive of other evidence here because no other witness testified to the abuse Larue suffered.

The key question, however, is whether the trial court's limiting instruction to the jury to disregard Larue's testimony about her prior abuse could cure the error. To neutralize any possible prejudice, the trial court instructed the jury, and repeated at defense counsel's request, "You are to disregard all the evidence presented by Ms. Larue concerning allegations of prior physical contact between her and the defendant. *I repeat, you are to disregard utterly* all the evidence presented by Ms. Larue concerning allegations of prior physical contact between her and the

---

[40] State v. Mak, 105 Wn.2d 692, 701, 718 P.2d 407 (1986).

[41] State v. Rodriguez, 146 Wn.2d 260, 269-70, 45 P.3d 541 (2002).

defendant."[42] "'A jury is presumed to follow jury instructions and that presumption will prevail until it is overcome by a showing otherwise.'"[43]

Lopez Castro argues that State v. Escalona[44] illustrates why the limiting instruction could not neutralize the prejudicial effect of Larue's prior abuse testimony. During Escalona's trial on a charge of assault in the second degree with a deadly weapon, Escalona's roommate, the victim, explained that he was nervous that he would be stabbed in a confrontation with Escalona because Escalona "already has a record and had stabbed someone."[45] The trial court ordered the comment stricken, denied a motion for a mistrial, and instructed the jury to disregard the remark.

This court reversed, viewing the unsolicited statement as "extremely serious" because it was inadmissible evidence of a prior crime, there was a paucity of credible evidence against Escalona, and the State's case consisted primarily of the victim's testimony, which contained many inconsistencies.[46] This court also found that the evidence was not cumulative as any such evidence was excluded by the ruling in limine. And finally, this court found that "it would be extremely difficult, if not impossible, in this close case for the jury to ignore this seemingly relevant fact."[47]

---

[42] RP (Oct. 14, 2015) at 260-61 (emphasis added).

[43] Carnation Co., Inc. v. Hill, 54 Wn. App. 806, 811, 776 P.2d 158 (1989) (quoting Tennant v. Roys, 44 Wn. App. 305, 315, 722 P.2d 848 (1986)); see also State v. Stenson, 132 Wn.2d 668, 730, 940 P.2d 1239 (1997).

[44] 49 Wn. App. 251, 742 P.2d 190 (1987).

[45] Id. at 255.

[46] Id.

[47] Id. at 256.

We conclude this situation is distinguishable from Escalona. Escalona was a "close case" because the only evidence of guilt was internally inconsistent testimony of the victim who made the improper statement.[48] Unlike Escalona, the State's case here was strong. The State offered the eyewitness testimony of A.L.C., who testified that she loves her father. Stephanie testified consistently with A.L.C.'s description of key aspects of the incident. The State also offered the testimony of the police officer who responded to the 911 call. The officer testified that when he found Lopez Castro in the parking lot of Stephanie's apartment, the officer asked, "Where is the knife?" and Lopez Castro responded that "it was inside of his car."[49] Stephanie and A.L.C.'s accounts were corroborated by physical evidence, including Lopez Castro's weapon, seized at the scene, and identified by A.L.C. as the State's trial exhibit 8.

Further, Juror 6 interrupted the prosecutor's closing argument here, asking, "Wasn't Tara Larue's testimony wiped from the records?"[50] The phrasing of Juror 6's question reveals that the juror clearly understood the court's limiting instruction. And after a *third* reading of the instruction, it is appropriate to conclude that the rest of the jury understood the instruction. Larue also had several inconsistencies in her testimony and was impeached on cross-examination. For example, she testified she did not report the July 20 incident because she did not have access to a phone, but she texted Stephanie on July 19 from her roommate's phone. On cross-examination, Larue revealed that she knew Stephanie was not at home on July 20 and that was

---

[48] Id.

[49] RP (Oct. 13, 2015) at 168.

[50] RP (Oct. 15, 2015) at 390.

the reason she did not report the incident. She further revealed that she did not report the incident because she had warrants out for her arrest. These inconsistencies were explored in closing argument.

In determining whether a mistrial should have been granted, "'[e]ach case must rest upon its own facts.'"[51] Here, Larue testified that she went with Lopez Castro to Stephanie's apartment on July 20 because she was afraid of him: "[I]t wasn't an option to say no to German ever. . . . He wouldn't accept no. I just did what he said to keep myself safe."[52] Her testimony clearly reveals Lopez Castro's domination and control. Consistent with this background, Larue's testimony was not the irregularity in Escalona of a witness unexpectedly blurting out that the defendant had a record and previously stabbed someone.

We conclude the trial court did not abuse its discretion in denying the motion for a mistrial. It was within the court's discretion to determine the impact in this setting and whether the jury could understand the limiting instruction. The trial court repeated the instruction three times. And the jury acquitted on the harassment charge. Given the strength of the State's case, the court's repeated limiting instructions, the phrasing of Juror 6's question during closing argument, the inconsistencies in Larue's testimony, and her impeachment on cross-examination, the limiting instruction cured the prejudicial effect of Larue's testimony about her prior abuse.

---

[51] State v. Morsette, 7 Wn. App. 783, 789, 502 P.2d 1234 (1972) (quoting State v. Albutt, 99 Wash. 253, 259, 169 P. 584 (1917)).

[52] RP (Oct. 13, 2015) at 185.

14

Lopez Castro argues the prosecutor committed misconduct by preemptively introducing Larue's allegations of prior abuse, thereby depriving Lopez Castro of his right to a fair trial. We disagree.

A defendant claiming prosecutorial misconduct bears the burden of establishing that the challenged conduct was both improper and prejudicial.[53] When the defendant objects to alleged misconduct or moves for a mistrial, an appellate court accords the trial court deference because it is in the best position to assess potential prejudice.[54] Consequently, we review the trial court's ruling on alleged misconduct for an abuse of discretion and will overturn the court's decision only if the defendant demonstrates a substantial likelihood that the alleged misconduct affected the verdict.[55]

Citing State v. Fisher,[56] Lopez Castro contends his prior acts of abuse towards Larue were admissible to explain Larue's delayed reporting only if the defense first made an issue of the delay. He misreads Fisher.

Fisher upheld a trial court ruling that prior physical abuse "was admissible conditioned upon the defense's making an issue of [the victim's] delayed reporting."[57] Fisher did not hold that delayed reporting must be made an issue before ER 404(b) evidence is admissible to explain a delay. Moreover, here, during the pretrial hearing on the motions in limine, the trial court expressly asked the parties whether they

---

[53] State v. Cheatam, 150 Wn.2d 626, 652, 81 P.3d 830 (2003).

[54] Stenson, 132 Wn.2d at 719.

[55] State v. Lindsay, 180 Wn.2d 423, 430-31, 326 P.3d 125 (2014).

[56] 165 Wn.2d 727, 745-46, 202 P.3d 937 (2009).

[57] Id. at 746.

wanted "to get into" the issue of Larue's failure to report the July 20 incident, and both parties responded affirmatively. And, as the State points out, when the State reasonably anticipates an attack on its witness's credibility, it may address the issue on direct examination.[58] Therefore, Lopez Castro fails to establish that the prosecutor's preemptive introduction of Larue's allegations of prior abuse was improper.

*Appellate Costs*

Lopez Castro argues that if the State is the substantially prevailing party on appeal, we should not impose costs against him because he is indigent.

Appellate courts may require an adult offender convicted of an offense to pay appellate costs.[59] The commissioner or clerk will award costs if the State is the substantially prevailing party on appeal, "unless the appellate court directs otherwise in its decision terminating review."[60]

A determination of a criminal defendant's indigency is entrusted to the trial judge, whose finding of indigency we respect unless we are shown good cause not to do so.[61] Under RAP 15.2(f), where a party has been granted an order of indigency, the party and the party's counsel must bring to the attention of the trial court any

---

[58] See State v. Bourgeois, 133 Wn.2d 389, 402, 945 P.2d 1120 (1997) (explaining it was not error for the State to question a witness about his reluctance to testify "because his credibility was attacked. Although the attack occurred after [the witness] was directly examined by the State, it was reasonable for the State to anticipate the attack and 'pull the sting' of the defense's cross-examination").

[59] RCW 10.73.160(1).

[60] RAP 14.2.

[61] State v. Sinclair, 192 Wn. App. 380, 393, 367 P.3d 612, review denied, 185 Wn.2d 1034, 377 P.3d 733 (2016).

significant improvement during review in the party's financial condition. We give "a party the benefits of an order of indigency throughout the review unless the trial court finds the party's financial condition has improved to the extent that the party is no longer indigent."[62]

The trial court issued an order finding Lopez Castro indigent and authorizing him to appeal in forma pauperis. The trial court has not found that his financial condition has improved or is likely to improve. The State offers no new financial information. We therefore presume that Lopez Castro remains indigent. Under these circumstances, we conclude that an award of appellate costs to the State is not appropriate.

We affirm.

WE CONCUR:

Cox, J.

---

[62] Id. (quoting RAP 15.2(f)).

17